**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

**ANTHONY BELFIORE, Individually and on Behalf of All Others Similarly Situated,**

               **Plaintiff,**

**v.**

**THE PROCTER & GAMBLE COMPANY,**

               **Defendant.**

**MEMORANDUM & ORDER**

**14-CV-4090**

**Related cases:**

**14-CV-1142**

**15-CV-2909**

**15-CV-2910**

**15-CV-2928**

**15-CV-4579**

**Appearances**

Anthony Belfiore:

Lester L. Levy
Michele Fried Raphael
Roy Herrera
Matthew Insley-Pruitt
Robert Scott Plosky
Wolf Popper LLP
845 Third Avenue
12th Floor
New York, NY 10022
(212)759-4600
llevy@wolfpopper.com
mraphael@wolfpopper.com
minsley-pruitt@wolfpopper.com
rplosky@wolfpopper.com

The Procter and Gamble Company:

Emily Henn
Covington & Burling LLP
333 Twin Dolphin Drive
Suite 700
Redwood Shores, CA 94065
(650) 632-4715
ehenn@cov.com

Andrew D. Schau
Claire Catalano Dean
Michael Sochynsky
Covington & Burling LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
(212) 841-1078
aschau@cov.com
ccdean@cov.com
msochynsky@cov.com
swinner@cov.com

Cortlin Lannin
Covington & Burling LLP
One Front Street
San Francisco, CA 94111
(415) 591-6000
clannin@cov.com

**JACK B. WEINSTEIN, Senior United States District Judge:**


## Table of Contents

I.  Introduction ........................................................................................................... 5

II.  Facts .................................................................................................................... 7

III. Pending Litigation and Administrative Proceedings ........................................ 12

    A.  Litigation ...................................................................................................... 12

        1.  In This Court ......................................................................................... 12

        2.  Other Jurisdictions ............................................................................... 14

        3.  Municipal Plaintiffs ............................................................................. 17

    B.  Federal Trade Commission Action Against Competitor of Defendant ........... 17

    C.  Informal Inquiry by FTC of Defendant ....................................................... 21

    D.  Proposed Legislation in New York City ...................................................... 22

    E.  Warnings by Municipalities to Residents .................................................... 22

    F.  Public Discourse Regarding "Flushable" Wipes .......................................... 23

IV. What is "Flushable"? ........................................................................................ 24

    A.  According to Plaintiff .................................................................................. 24

    B.  According to Plaintiff's Expert ................................................................... 24

    C.  According to Defendant ............................................................................... 25

    D.  According to Defendant's Experts ............................................................... 26

    E.  According to Other Experts ......................................................................... 27

    F.  According to The Association of the Nonwoven Fabrics Industry & European
        Counterpart ................................................................................................. 28

    G.  According to Federal Trade Commission ..................................................... 29

    H.  According to Dictionaries ............................................................................ 29

    I.  Lack of Consumer Surveys ......................................................................... 30

V.  Procedural History and Instant Motions ........................................................... 30

VI. Expert Reports .................................................................................................. 32

    A.  Plaintiff's Expert: Colin B. Weir ................................................................ 32

    B.  Defendant's Expert: Carol A. Scott, Ph.D. .................................................. 34

VII.  New York General Business Law § 349 ........................................................ 35

VIII.  N.Y. C.P.L.R. § 901(b)'s Limits on Predetermined Damages and *Shady Grove* ........... 36

    A.  *Erie* ........................................................................................................... 36

    B.  N.Y. C.P.L.R. § 901(b) and Federal Rule of Civil Procedure 23 .................. 38

    C.  *Shady Grove* ............................................................................................. 41

    D.  *Shady Grove* Is Binding ............................................................................ 47

IX. Class Action ...................................................................................................... 48

    A.  Rule 23(a)(1): Numerosity .......................................................................... 51

    B.  Rule 23(a)(2): Commonality ....................................................................... 52

    C.  Rule 23(a)(3): Typicality ............................................................................ 56

    D.  Rule 23(a)(4): Adequacy of Representation ................................................. 59

    E.  Implied Requirement of Ascertainability .................................................... 61

    F.    Federal Rule of Civil Procedure 23(b) Factors ................................................................ 64

      1.    Rule 23(b)(2) Injunctive Relief ................................................................................ 64

      a.    Article III Standing.................................................................................................. 64

      b.    Likely 23(b)(2) Class Certification ........................................................................ 66

      2.    Rule 23(b)(3) Damages ............................................................................................ 67

      a.    23(b)(3): Predominance............................................................................................ 68

      b.    23(b)(3): Superiority ................................................................................................ 73

      c.    Likely Denial of 23(b)(3) Class Certification ........................................................ 78

X.  Primary Jurisdiction Doctrine ............................................................................................ 79

    A.    Law ............................................................................................................................ 79

    B.    Federal Trade Commission ...................................................................................... 84

    C.    Application of Law to Facts...................................................................................... 88

      1.    Control by Judges or the Federal Trade Commission? ................................................ 89

      2.    Federal Trade Commission's Discretion .................................................................... 89

      3.    Inconsistent Rulings? ................................................................................................ 90

      4.    Existing Consideration by Federal Trade Commission............................................. 90

      5.    Advantages Versus Costs .......................................................................................... 90

XI. Court's Inherent Authority to Stay Decision on Class Certification ...................................... 91

XII.    Conclusion ............................................................................................................... 92

## I.  Introduction

This consumer class action is stayed because the Federal Trade Commission ("FTC") probably can protect consumers more effectively than this court.

Six related putative class actions are pending in this court.  Consumers allege they paid a premium for "flushable" wipes—moist towelettes intended for use in place of, or in addition to, toilet paper—that are not actually "flushable."  Similar class actions are pending in other courts.  A number of municipalities have brought a class action against manufacturers of similar products, claiming clogging of their sewage disposal facilities.

The FTC is engaged in an ongoing inquiry into defendant's use of the term "flushable."  One of defendant's competitors recently negotiated a consent agreement with the FTC, which would limit that manufacturer's description of its products as "flushable."

The "flushable" industry has sales in the multi-billion dollar range.  It includes many manufacturers, different designs, and a variety of brands.  One flushable wipe begins to disintegrate upon entering the toilet bowl.  Defendant's, designed to break down through chemical processes and physical manipulation, shows no signs of coming apart while in a home's plumbing, or possibly even after it reaches a municipal sewage plant.

Plaintiff Anthony Belfiore ("plaintiff") moves to certify a class of consumers in New York who purchased wipes marked "flushable" manufactured by defendant.  He claims that the "flushable" wipes, for which he paid a premium over nonflushable moistened wipes, are not "flushable."  Originally, plaintiff sought money damages, either based on the premium price paid or a fixed statutory amount; he now seeks only a fixed statutory amount ($50) for each purchase by each class member.  He also moves to enjoin defendant from calling its product "flushable" or

"safe for sewer and septic systems." In addition, plaintiff seeks individual damages for harm to his home's waste pipes.

Class actions can provide important protection to consumers. The present case presents somewhat more complex issues than those in most class actions involving low value consumer products. It requires special management.

Here, certification of a statutory damages class would pit New York State's consumer protection law, which explicitly prohibits statutory damages in class actions, against the federal class action rule, which contains no such prohibition. A recent Supreme Court precedent mandates privileging the federal class action rule over a state's in cases pending in federal courts. But federal certification would undermine the substantive state law's policy: to prevent catastrophic and unfair judgments against defendants—a result to be avoided if possible. A different damage recovery for this plaintiff and his class in federal court (to which the case was removed) than would have been afforded in state court (where plaintiff originally filed his action) would also contravene *Erie*, which is designed to prevent forum shopping.

Certification of a damages *or* an injunctive class might thwart the development of an integrated and transparent national market. With multiple cases before this court and others across the nation (each at a different phase and featuring different substantive state laws), the FTC's engagement in an ongoing inquiry of defendant, and the agency's pending agreement with another manufacturer, there is a substantial risk of inconsistent judgments regarding the meaning of "flushable." A robust management of the "flushable" problem by the FTC, rather than by courts, could avoid unnecessary inconsistencies and controversies, helping manufacturers, retail vendors and consumers alike.

The primary jurisdiction doctrine is invoked to stay the instant case while the FTC exercises jurisdiction, if it chooses to do so. The issue of an appropriate definition of "flushable" wipes and related issues are referred to the FTC.

The parties may move to lift the stay when circumstances change. Based on information now before it, the court would likely deny certification of a damages class but certify an injunctive class. To assist the parties, the court outlines below its analysis of the pending class certification motions.

## II. Facts

"Promise, large promise, is the soul of advertisement." Ira M. Millstein, *Federal Trade Commission and False Advertising*, 64 Colum. L. Rev. 439, 439 (1964) (footnote omitted).

Plaintiff has lived in the New York area all his life. Decl. of Claire Catalano Dean in Supp. of Def.'s Mot. to Deny Class Cert., at Ex. A, Anthony Belfiore Dep., Feb. 27, 2015, ECF No. 63-1, ("Pl.'s Feb. 27 Dep.") at 9:2–7. Now sixty-one, he no longer works because of a back injury sustained on the job in 2003. He is on medical disability. *Id.* at 9:10–21. Prior to the injury he worked as an ironworker on projects involving steel, including the construction and repair of buildings and bridges. *Id.* at 10:19–25. Before that he was a roofer and a carpenter. Decl. of Lester L. Levy in Supp. of Pl.'s Mem. of Law in Opp'n to Def.'s Mot. to Deny Class Cert., at Ex. A, Anthony Belfiore Dep., Mar. 27, 2015, ECF No. 79-2 ("Pl.'s Mar. 27 Dep."), at 11:11–18. He appears to be a responsible worker-consumer.

Defendant manufactures bath tissues and bath wipes under the "Charmin" label. Decl. of Marlene Otero in Supp. of Def.'s Mot. to Deny Class Cert., Feb. 27, 2015, ECF No. 66, at ¶ 1. The product at issue in the instant case is "Freshmates," which are advertised as "flushable

wipes." Decl. of Scott Richards in Supp. of Def.'s Mot. to Deny Class Cert., Feb. 27, 2015, ECF

No. 67, at ¶ 1. The packaging is as follows:





Ct. Ex. 23, June 19, 2015. In addition to the labels "flushable" and "flushable wipes," the

package states that the wipes are "Septic Safe" and "Safe for sewer and septic systems":



*Id.* (emphasis in the form of a red box). The claims are repeated in Spanish and French.

The packaging, which has not changed since 2011, also advises consumers: "For best results, flush only one or two wipes at a time." *Id.*; Science Day Part I Hr'g Tr., June 19, 2015 ("Science Day Part I"), at 189:15–24; Decl. of Lester L. Levy in Supp. of Pl.'s Mot. for Class Cert., at Ex. D, Dep. of Marlene Otero (Section Head of Research and Development), Jan. 26, 2015, ECF No. 62-2 ("Otero Dep."), at 46:2–4 (stating that she was unaware of any packaging changes between 2011 and January 2015).

Freshmates are sold in 40, 80, and 120-count packages. Otero Dep. 49:7–20. They cost substantially more than ordinary toilet paper and non-flushable wipes. Class Cert. Oral Arg. Hr'g Tr., Aug. 12, 2015, ECF No. 127 ("Class Cert. Hr'g Tr."), at 18:3–19:15.

Freshmates themselves "are pre-moistened wipes . . . intended for personal hygiene use in the bathroom setting." Science Day Part I 184:15–17 (Sabaliunas). The wipes are formed and bonded though a process of "hydroentanglement," in which fine, powerful jets of water are used

to entangle a wood-pulp base. *Id.* at 185:14–18. The base, which is moistened with a "soaking liquid," is structurally supported by a chemical binder. *Id.* at 184:25–186:7. The wipes, it is claimed, lose strength and begin to disintegrate when dropped into the toilet upon exposure to physical forces and biological factors found in wastewater systems. *Id.* at 187:13–18.

Defendant offers reimbursements to consumers who complain that Freshmates caused a clog. Class Cert. Hr'g Tr. 45:13–17.

Plaintiff's account of his problem with the Charmin product is as follows: Around February 2014, he purchased Charmin "Freshmates" from his local grocer. Pl.'s Mar. 27 Dep. 26:3–30:17. Prior to purchase, he says he viewed the package and the price, which was between four and five dollars. *Id.* at 31:16–17, 33:13–35:9. He read the instructions on the package. *Id.* at 34:20–21. He selected the wipes "[b]ecause they were flushable." *Id.* at 36:4–6.

After each use in his residence, plaintiff flushed one or two Freshmates down the toilet. *Id.* at 47:13–15. He says he never flushed more than two at a time. *Id.* at 47:16–17. His wife also used the product. *Id.* at 47:19–23; Decl. of Lester L. Levy in Supp. of Pl.'s Mem. of Law in Opp'n to Def.'s Mot. to Deny Class Cert., at Ex. B, Alison Belfiore Dep., Mar. 27, 2015, ECF No. 79-2 ("Alison Belfiore Dep."), at 27:7–9. She never flushed more than two at a time. Alison Belfiore Dep. 30:3–5.

Plaintiff experienced plumbing problems, including clogging and sewer back-up. Pl.'s Mar. 27 Dep. 82:11–25. He called a plumber, who removed Freshmates and other materials from the household's sewer pipes and charged plaintiff $526.83. *Id.*; Decl. of Lester L. Levy in Supp. of Pl.'s Mem. of Law in Opp'n to Deny Class Cert., at Ex. C, Louis Sudberg Dep., Dec. 19, 2014, ECF No. 79-2, at 22:13–28:18. Plaintiff has yet to pay the bill. Pl.'s Mar. 27 Dep. 85:20–21.

A subsequent inspection of plaintiff's plumbing, conducted by defendant's expert, revealed root intrusions, pipe misalignments and some rust. Decl. of Terence O'Shea in Supp. of Def.'s Mot. to Deny Class Cert., Feb. 27, 2015, ECF No. 65, at ¶¶ 7–9. The inspection also unearthed two other items stuck in the house's plumbing. *Id.* at ¶ 10. An employee of defendant—who is responsible for testing and validating defendant's products—later posited, based on the "embossed pattern," that the two objects were a non-flushable "Clorox" wipe and a non-flushable feminine hygiene product. Decl. of Darius Sabaliunas in Supp. of Def.'s Mot. to Deny Class Cert., Feb. 27, 2015, ECF No. 68., at ¶¶ 2, 9–11, 13.

Plaintiff and his wife testified that neither had flushed baby wipes down the toilet. Pl.'s Mar. 27 Dep. 123:7–16; Alison Belfiore Dep. 26:4–10. His wife also testified she did not use feminine hygiene wipes or pre-moistened facial wipes and therefore she did not flush any. Alison Belfiore Dep. 26:15–27:3. Both swore that their adult children—who visited with their own young children— had not flushed baby wipes at the home, although plaintiff and his wife could not so testify with certainty. Pl.'s Mar. 27 Dep. 44:21–45, 123:12–16, 125:7–13; Dep. of Alison Belfiore 26:4–14.

Plaintiff spoke about his potential role as class representative:

> Q:      . . . [W]hat obligations would those be?
>
> A:      To do the best that I can for myself and all the other people involved in the case, go through with it, and to make sure I could see if I could do something about the product.
>
> . . .
>
> Q:      But what . . . activity . . . would be required of you, as you understand it?
>
> A:      I would probably have to go to court . . .
>
> Q:      Anything else?

A:      And to look out . . . for their interest.

. . .

Q:      —what do you expect to do? . . . [And] I would include anything you have done and anything you would expect to do in the future.

A:      I have answered depositions.  I have been to court already [for the case].  I show an interest that I want to take care of it, and I would look out—that's what I want to do.  I want to do all I could, anything I could to take care of this problem.

Pl.'s Mar. 27 Dep. 102:4–104:13.

## III.    Pending Litigation and Administrative Proceedings

### A.  *Litigation*

1.  In This Court

Separately before this court are five additional putative class actions alleging that

"flushable" wipes, manufactured and/or sold by different defendants, are not "flushable":

- Pending in *Kurtz. v. Kimberly-Clark Corp. & Costco Wholesale Corp.*, No. 14-CV-1142 (E.D.N.Y. filed Feb. 21, 2014) is consumer-plaintiff's motion to certify six classes of consumers who purchased flushable wipes sold by defendant Costco Wholesale Corporation and other flushable wipes manufactured by defendant Kimberly-Clark Corporation.  Alleged are violations of the New Jersey Consumer Fraud Act § 56:8-1, New York General Business Law §§ 349 and 350, and common law causes of action.  Both injunctive and monetary relief are sought. Argument on class certification is scheduled for October 9, 2015.

- *Armstrong v. Costco Wholesale Corp. & Nice-Pak Products, Inc.*, No. 15-CV-2909 (E.D.N.Y. filed May 19, 2015) is a putative class action filed by a consumer

who purchased "flushable" wipes sold by defendant Costco Wholesale Corporation and manufactured by defendant Nice-Pak Products, Inc. Alleged are violations of Oregon's Unlawful Trade Practices Act, O.R.S. § 646.605 et seq., and common law causes of action. Both injunctive and monetary relief are sought. Defendants have answered the complaint.

- *Honigman v. Kimberly-Clark Corp.*, No. 15-CV-2910 (E.D.N.Y. filed May 19, 2015; complaint filed May 20, 2015) is a putative class action brought by a consumer who purchased "flushable" wipes manufactured by defendant Kimberly-Clark Corporation. Alleged are violations of New York General Business Law §§ 349 and 350 and common law causes of action. Both injunctive and monetary relief are sought. Defendant has answered the complaint.

- *Palmer & Palmer v. CVS Health & Nice-Pak Products, Inc.*, No. 15-CV-2928 (E.D.N.Y. filed May 20, 2015) is a putative class action brought by consumers who purchased flushables sold by defendant CVS Health and manufactured by defendant Nice-Pak Products, Inc. An amended complaint was filed on July 9, 2015. Alleged are violations of Maryland Consumer Protection Act § 13-301 and common law causes of action. Both injunctive and monetary relief are sought. Defendants have answered the amended complaint.

- *Richard & Richard v. Wal-Mart Stores, Inc. & Rockline Indus.*, No. 15-CV-4579 (E.D.N.Y. filed Aug. 5, 2015) is a putative class action brought by consumers who purchased flushable wipes manufactured by defendant Rockline Industries and sold by defendant Wal-Mart Stores, Inc. Alleged are violations of New Hampshire Regulation of Business Practices for Consumer Protection § 358-A:2

13

and common law causes of action.  Both injunctive and monetary relief are

sought.  Defendants have until October 21, 2015 to answer or otherwise respond

to the complaint.

    2.   Other Jurisdictions

Cases involving flushable wipes have been filed in other jurisdictions:

- *Davidson v. Kimberly-Clark Corp., Kimberly-Clark Worldwide, Inc. & Kimberly-Clark Global Sales, LLC*, No. 14-537962 (Cal. Super. Ct. for the Cnty. of San Francisco filed Mar. 13, 2014), *removed*, No. 14-CV-01783 (N.D. Cal. Apr. 17, 2014) is a putative class action by a consumer who purchased various flushable wipes manufactured by defendants.  Alleged were violations of California's consumer protections laws and common law causes of action.  The motion to dismiss was granted in part and denied in part.  The case is on appeal.  *See Davidson v. Kimberly-Clark Corp. et al.*, No. 15-16173 (9th Cir. appeal filed June 11, 2015).

- *Meta v. Target Corp. & Nice-Pak Products, Inc.*, No. 14-CV-00832 (N.D. Ohio filed Apr. 18, 2014) is a putative class action brought by a consumer who purchased flushable wipes sold by defendant Target Corporation and manufactured by defendant Nice-Pak Products, Inc.  Alleged are violations of Ohio consumer protection laws, the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 et seq., and common law causes of action.  On defendants' partial motions to dismiss, the court dismissed some of the common law causes of action.  Briefing on motions for summary judgment and for class certification is scheduled to be completed in May 2016.

- *Machlan v. Procter & Gamble Co. & Nehemiah Mfg. Co.*, No. 14-538168 (Cal. Super. Ct. for the Cnty. of San Francisco filed Mar. 21, 2014), *removed*, No. 14-CV-01982 (N.D. Cal. Apr. 29, 2014) is a putative class action brought by a consumer who purchased Charmin Freshmates (manufactured by defendant Procter & Gamble Co.) and Pampers Kandoo Flushable Wipes (licensed by defendant Procter & Gamble Co. to defendant Nehemiah Mfg. Co. for manufacture). Alleged were violations of the California consumer protection laws and common law causes of action. The court dismissed all claims against Procter & Gamble Co. arising from Charmin products and remanded the remaining claims for injunctive relief to state court. *See Machlan v. Procter and Gamble*, 77 F. Supp. 3d 954 (N.D. Cal. 2015). The remainder of the federal case is stayed until the state court reaches a decision.

- *Sweeney & Copher-Sweeney v. Kimberly-Clark Corp., Wal-Mart Stores, Inc. & Rockline Industries, Inc.*, No. 8:14-CV-3201 (M.D. Fla. filed Dec. 24, 2014) is a putative class action by consumers who purchased various flushable wipes manufactured by defendants Kimberly-Clark Corp. and Rockline Industries, Inc., and sold by defendant Wal-Mart Stores, Inc. Alleged are violations of the Florida consumer protection laws and common law causes of action. Plaintiffs seek injunctive relief and damages. Defendants' separate motions to dismiss were granted in part and denied in part. Some of the complaint was dismissed without prejudice and with leave to file an amended complaint by October 9, 2015.

- *Allen & Jones v. Procter & Gamble Co. & Nehemiah Mfg. Co.*, No. 15-CV-38 (N.D. Fla. filed Jan. 27, 2015) was a putative class action brought by consumers

who purchased Charmin Freshmates (manufactured by defendant Procter & Gamble Co.) and Pampers Kandoo Flushable wipes (allegedly licensed by defendant Procter & Gamble Co. to defendant Nehemiah Mfg. Co. for manufacturing). Alleged were violations of the Florida consumer protections laws and common law causes of action. The case was closed in June 2015, after the parties filed a stipulation for voluntary dismissal with prejudice.

• *Pettit v. Procter & Gamble Co.*, No. 15-545175 (Cal. Super. Ct. for the Cnty. Of San Francisco filed Apr. 6, 2015), *removed*, No. 15-CV-02150 (N.D. Cal. May 13, 2015) is a putative class action by consumers who purchased Charmin Freshmates manufactured by defendant. Alleged were violations of California's consumer protection laws and common law causes of action. Defendant has answered the complaint. Class certification briefing shall be completed by March 2016.

• *Ramcharitar v. Procter & Gamble Co.*, No. 15-CV-00457 (S.D. Ohio filed July 10, 2015) is a putative class action by consumers who purchased Charmin Freshmates manufactured by defendant. Alleged are violations of Florida's consumer protection laws, the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 et seq., and common law causes of action. Plaintiff has filed a complaint.

• *Jonah v. Kimberly-Clark Corp., Kimberly-Clark Global Sales, LLC & Kimberly-Clark Worldwide, Inc.*, No. 534157 (Cal. Super. Ct. for the Cnty. of San Mateo filed June 9, 2015), *removed*, No. 15-CV-03243 (N.D. Cal. July 13, 2015) is a putative class action by consumers who purchased various flushable wipes manufactured by defendants. Alleged are violations of California consumer protection laws and

common law causes of action.  The case is stayed, pending the Ninth Circuit's

disposition of *Davidson v. Kimberly-Clark Corp. et al.*

      3.   Municipal Plaintiffs

On April 23, 2015, the City of Wyoming, Minnesota filed a putative class action in the

District Court of Minnesota against six "leading" manufacturers of "flushable" wipes: Procter &

Gamble Co., Kimberly-Clark Corp., Nice-Pak Products, Inc., Professional Disposables

International, Inc., Tufco Technologies, Inc. & Rockline Industries.  Alleged are "unfair

practices associated with design, testing, manufacturing, distribution and/or sale of allegedly

flushable bathroom wipes."  Civil Cover Sheet, No. 15-CV-2101 (D. Minn. Apr. 23, 2015), ECF

No. 1-1.  Other cities, including Princeton, MN; Mankato, MN; Fergus Falls, MN; Elk River,

MN; Perham, MN, and the Village of Holmen, WI joined as putative class representatives, along

with the Chisago Lakes Joint Sewage Treatment Commission and with the Sauk Centre Public

Utilities Commission.  First Am. Class Action Compl., No. 15-CV-2101 (D. Minn. April 23,

2015), ECF No. 61 ("Am. Compl."), at ¶¶ 7–14; *see also* John Reinan, *Minnesota cities fighting*

*back against flushable wipes*, Star Tribune, Sept. 3, 2015, http://www.startribune.com.  They

claim that "[b]ecause the so-called flushable wipes do not degrade and disperse like toilet paper,

they ultimately get caught in the bar screen and block the passage of wastewater, causing the

system to shut down and requiring their manual removal."  *Id.* at ¶ 29.  Plaintiffs seek to

represent a national class of "entities that own, operate or manage wastewater treatment facilities

in the United States" and three sub classes.  *Id.* at ¶¶ 98–103.  Motions to dismiss are pending.

**B.**  ***Federal Trade Commission Action Against Competitor of Defendant***

On May 18, 2015, the Federal Trade Commission ("FTC") filed a complaint against

Nice-Pak Products, Inc. ("Nice-Pak"), a manufacturer of "flushable" wipes, alleging:

Respondent Nice-Pak has packaged, labeled, advertised, offered for sale, sold, or distributed moist toilet tissue, a personal hygiene product, throughout the United States. This moist toilet tissue is composed of non-woven fabric, specifically non-elemental chlorine bleached wood pulp, bicomponent fibers, and EP907 repulpable binder (the "Nice-Pak wipe"). Because of their composition, non-woven fabrics do not break down in water in a reasonably short amount of time. As a result, *products made from them can clog household plumbing systems, household septic systems, public sewer systems, and sewage treatment plant systems after being flushed.*

Complaint, *In the Matter of Nice-Pak Products, Inc.*, No. 132-3272, at ¶ 2 (May 18, 2015),

https://www.ftc.gov/system/files/documents/cases/150518nice-pakcmpt.pdf (last visited Sept.

28, 2015) ("FTC Complaint") (emphasis added).

The FTC published two separate counts against Nice-Pak. Regarding the

"Unsubstantiated Performance Claims," Count I reads:

In connection with the advertising, labeling, packaging, promotion, offering for sale, sale, or distribution of the Nice-Pak Wipes, [Nice-Pak] *has represented, directly or indirectly, expressly or by implication*, that:

A. The Nice-Pak Wipes are safe for sewer systems;

B. The Nice-Pak Wipes are safe for septic systems;

C. The Nice-Pak Wipes break apart shortly after flushing; and

D. The Nice-Pak *Wipes are safe to flush*; that is, they are safe for *household plumbing systems, household septic systems*, and public sewer systems.

*The representations set forth [above] were not substantiated at the time the representations were made.*

*Id.* at ¶¶ 6–7 (emphasis added).

Count II of the complaint, "Means and Instrumentalities," details the following:

Respondent has provided to its trade customers advertising, labeling, packaging, or purported substantiation materials . . .

> which contain, among other things, *unsubstantiated representations*, as described . . . above.
>
> By providing its trade customers with these advertising, labeling, packaging, or purported substantiation materials, *[Nice-Pak] has provided its trade customers the means and instrumentalities for the commission of deceptive acts and practices.*

*Id.* at ¶¶ 8–9 (emphasis added).

In addition to these counts, the FTC declares that the "acts and practices of [Nice-Pak] as alleged in this complaint constitute unfair or deceptive acts or practices, in or affecting commerce in violation of Section 5(a) of the Federal Trade Commission Act." *Id.* at ¶ 10; *see also* 15 U.S.C. § 45(a).

On May 22, 2015, the FTC released a proposed agreement and consent order with Nice-Pak and solicited public comment. Analysis of Proposed Consent Order in the Matter of Nice-Pak, Inc. to Aid Public Comment, 80 Fed. Reg. 29706 (May 22, 2015) ("Analysis of Proposed Consent Order").

"Part I" of the proposed agreement containing the consent order between the FTC and Nice-Pak agrees, prospectively, to alter its representations regarding flushability:

> IT IS ORDERED that [Nice-Pak], directly or through any corporation, partnership, subsidiary, division, trade name, or other device, in connection with the manufacturing, labeling, packaging, advertising, promotion, offering for sale, sale, or distribution of any Covered Product in or affecting commerce, *shall not make any representation, in any manner, expressly or by implication, including through the use of a product name, endorsement, depiction, illustration, trademark, or trade name*, that the Covered Product:
>
> A. *is safe for sewer systems;*
>
> B. *is safe for septic systems;*
>
> C. *breaks apart shortly after flushing;*

*D. will not clog household plumbing systems;*

*E. will not clog household septic systems;*

*F. is safe for plumbing;*

*G. is safe to flush;*

*H. dissolves or disperses when interacting with water; or*

*I. is flushable,*

*unless the representation is non-misleading, and, at the time the representation is made, [Nice-Pak] possesses and relies upon competent and reliable evidence,* which, when appropriate based on the expertise of professionals in the relevant area must be competent and reliable scientific evidence, that, when considered in light of the entire body of relevant and reliable evidence, *is sufficient in quantity and quality based on standards generally accepted in the relevant fields to substantiate that the representation is true*. For the purposes of this Part, "competent and reliable scientific evidence" means tests, analyses, research, or studies that have been conducted and evaluated in an objective manner by qualified persons, using procedures generally accepted in the profession to yield accurate and reliable results. Specifically, *any tests, analyses, research, studies, or other evidence purporting to substantiate any of the above representations must at least*:

A. demonstrate that the Covered Product *disperses in a sufficiently short amount of time after flushing to avoid clogging*, or other operational problems in, household and municipal sewage lines, septic systems, and other standard wastewater equipment; and

B. substantially replicate the physical conditions of the environment in which the Covered Product is claimed, directly or indirectly, expressly or by implication, to be properly disposed of; or, if no specific environment is claimed, then in all environments in which the product will likely be disposed of.

Proposed Agreement Containing Consent Order, *In the Matter of Nice-Pak Products, Inc.*, No. 132-3272, May 18, 2015 ("Proposed FTC Agreement"), at 2–3 (emphasis added) (defining

"Covered Product" as "all wipes, including but not limited to Kirkland Signature Moist Flushable Wipes, and any moist toilet tissue or cloth.").

Part II of the "proposed [agreement containing a consent] order prohibits Nice-Pak from making any representation about moist toilet tissue unless the representation is non-misleading, and, at the time it is made, Nice-Pak possesses and relies upon competent and reliable evidence that substantiates the representation." Analysis of Proposed Consent Order at 29708; *see also* Proposed FTC Agreement at 3–4.

Parts III–IX of the proposed agreement establishes future administrative responsibilities for Nice-Pak with respect to the notification of wholesalers, retailers and customers, the filing of FTC compliance reports, the keeping of proper records, and the order's eventual termination. Analysis of Proposed Consent Order at 29708; *see also* Proposed FTC Agreement at 4–6.

Prior to the close of public comment on June 19, 2015, thirty-seven comments were submitted. *See* Federal Trade Commission, *#610: In the Matter of Nice-Pak Products, Inc.*, Comments, https://www.ftc.gov/policy/public-comments/initiative-610 (last visited Sept. 28, 2015); *cf.* Katherine Shaver, *Manufacturer Agrees to Stop Using "Flushable" Claim for Wipes That Utilities Say Clog Sewer Systems*, The Washington Post, June 23, 2015, http://www.washingtonpost.com.

## C. *Informal Inquiry by FTC of Defendant*

In supplemental briefing requested by the court on the potential application of the primary jurisdiction doctrine to plaintiff's request to certify an injunctive class, the instant defendant revealed that the FTC has "informally" inquired about its activities:

> [T]he FTC has made an informal inquiry to P&G concerning the *"flushability"-related claims that appear on the Freshmates label*. In response to the FTC's requests, P&G has voluntarily provided

> documents and test data to the FTC concerning the Freshmates product. P&G met with agency representatives earlier this year to discuss the Freshmates technology and labeling claims. *This in-person meeting has been supplemented by a number of telephone conferences to discuss follow-up items*. Insofar as P&G is aware, the FTC's informal inquiry is *ongoing*.
>
> While P&G is not privy to the agency's inquiry concerning the Nice-Pak product, a substantial part of the agency's examination of P&G's product has focused on the ability of various wipe products to pass through municipal sewage system facilities (a question that, as this Court has repeatedly observed, is *not* at issue in this case). *P&G has also submitted test data and other information to the FTC bearing on the flushability of Freshmates in consumers' homes*.

Def.'s Resp. to the Ct.'s Req. for Briefing on Primary Jurisdiction and Possible Stay of Decision on the Cert. of an Injunctive Class, Sept. 9, 2015, ECF No. 138, at 3 (emphasis added).

### D. *Proposed Legislation in New York City*

In February 2015, New York City Council Members introduced Int. 666-2015 (Flushable Wipes Bill). Comm. on Envt'l Prot. Int. 666, 2015 (N.Y.C. 2015). It was referred to the Council to the Committee on Environmental Protection. If enacted, the bill would amend the administrative code of New York City to "prohibit a nonwoven disposable product from being advertised, packaged or labeled as flushable or sewer or septic safe unless it passes a third party test that is approved by the commissioner of environmental protection." *Id.*; *see also* Matt Flegenheimer, *The Box Says Flush*, The New York Times, Mar. 13, 2015, at MB1.

### E. *Warnings by Municipalities to Residents*

Some cities across the country are advising residents not to flush wipes—labeled "flushable" or not—down the toilet. *See, e.g.*, Seattle Pub. Util., *What to do with Flushable Wipes, Ask Evelyn*, http://www.seattle.gov (last visited Sept. 28, 2015) ("do not flush any kinds of wipes down the toilet"); Beloit, WI Gov't, *No Wipes Down The Pipes*, Util. Dep't.,

http://www.beloitwi.gov (last visited Sept. 28, 2015) ("Unless it is toilet paper, it should not be flushed!"); City of Sauk Rapids, MN, Flushable Wipes Request From Utility Department, http://www.ci.sauk-rapids.mn.us (last visited Sept. 28, 2015) (do "not flush disposable wipes into the sanitary sewer system"); City of Lindstrom Message From the Public Works and Utility Departments, http://www.cityoflindstrom.us (last visited Sept. 28, 2015) ("anyone using flushable wipes please dispose of them in the garbage"); Aurora Water, *Service Line Protection Plans Offered by Area Companies*, https://www.auroragov.org (last visited Sept. 30, 2015) ("Do not flush baby wipes, flushable wipes or any paper product other than toilet paper. Those items do not break down quickly and can contribute to clogs.").

### F. *Public Discourse Regarding "Flushable" Wipes*

Significant media attention, domestically and internationally, has been devoted to questioning the flushability of "flushable" wipes. *See, e.g.*, Max Ehrenfreund, *Increasingly Clogged Sewers Attributed to Popular 'Flushable' Wipes*, The Washington Post, Sept. 23, 2013, http://www.washingtonpost.com (last visited Oct. 1, 2015); Carolyn Thompson, *What a Bummer! 'Flushable Wipes' Blamed for Sewer Woes*, Today, Sept. 24, 2013, http://www.today.com (last visited Sept. 28, 2015); Christopher Bonanos, *Public Enemy No. 2: Adults Have Grabbed Onto Baby Wipes For That Extra-Clean Feeling. Bad News For the Sewage System.*, New York Magazine, Oct. 4, 2013, http://nymag.com (last visited Oct. 1, 2015); Kathianne Boniello, *'Flushable' Wipes Clogging Up Drains Citywide*, NY Post, Mar. 2, 2014, http://www.nypost.com, (last visited Sept. 28, 2015); BBC News, *Who, What, Why: Why Can't They Make a Flushable Wipe?*, BBC, Mar. 19, 2015, http://www.bbc.com/news (last visited Sept. 28, 2015); Jenna Ross, *'Flushable Wipes' Can Cause Thousands to Fix Clogged Pipes*, The Star Tribune, Apr. 6, 2015, http://www.startribune.com (last visited Oct. 1, 2015); Bruce

Watson, *Don't Believe the Label 'Flushable': Disposable Wipes Clog Sewers Around the World*, The Guardian, May 26, 2015, http://www.theguardian.com (last visited Sept. 28, 2015); Douglas Hanks, *Miami-Dade's Sewage System Declares Flushable Wipes the Enemy*, Miami Herald, May 26, 2015, http://www.miamiherald.com (last visited Sept. 28, 2015); Jack Neff, *Could FTC and Supreme Court Send Flushable Wipes Down the Toilet?*, Adage, May 28, 2015, http://adage.com (last visited Sept. 28, 2015); Craig Freilich, *10.7 Million Plan May Fix Potsdam Wastewater Plant Woes*, North Country Now, Aug. 28, 2015, http://northcountrynow.com (last visited Sept. 28, 2015); *Flushable Wipes Cause Major Problem for Cincinnati Sewers*, FOX19, http://www.fox19.com (last visited Sept. 28, 2015); Wipes in the News, *"Flushable" Nonwoven and Baby Wipe Products in the News*, Maine Water Env't Ass'n, http://www.mewea.org  (last visited Sept. 28, 2015).

## IV.   What is "Flushable"?

The parties, and others, present myriad definitions of "flushable."

### A.  *According to Plaintiff*

Plaintiff defines "flushable" by way of stating what is "non-flushable":

> . . . Freshmates do not *disintegrate upon flushing*, [] they do not *break down sufficiently to pass through pipes*, and [] they *cause serious problems for property owners and municipalities*.

Mem. of Law in Supp. of Pl.'s Mot. for Class Cert., Feb. 27, 2015, ECF No. 58-1 ("Pl.'s Mem."), at 4 (emphasis added) (citations omitted).

### B.  *According to Plaintiff's Expert*

Plaintiff's expert, Robert Villee, is Executive Director of the Plainfield Area Sewerage Authority, a Regional Interceptor.  He has expertise in municipal sewage systems but not in consumer's plumbing or cesspools.  Science Day Part II Hr'g Tr., July 21, 2015 ("Science Day

Part II"), at 6:15–15, 72:10–12 (Villee).  Villee offers a narrow, pragmatic statement of

consumer's expectations:

> For the consumer, they just want it to *go away when they push the little silver handle on the big white thing* in the bathroom.  As long as it *goes away and doesn't cause them problems* they consider the product to be flushable . . .

*Id*. at 47:17–20 (emphasis added).

When pressed, he offered: "flushable" wipe must, from the perspective of a consumer or

a municipality, "disperse in a short period of time . . . [and] begin to lose strength almost after

it's flushed."  *Id.* at 49:18–19, 50:21–23 (emphasis added).

### C.  *According to Defendant*

Defendant's definition is less precise than plaintiff's:

> Plaintiff cites . . . magazine[s] and other sources to suggest that flushable wipes do not disintegrate as rapidly in water as conventional toilet tissue.  Even assuming that is true, that does not mean that Freshmates are not "flushable" or that using Freshmates will result in clogged pipes.

Def.'s Reply Mem. of Law in Supp. of its Mot. to Dismiss, Oct. 3, 2014, ECF No. 18, at 2 n.2

(internal citation omitted).  According to defendant, whether a wipe is "flushable" is a subjective

inquiry, unique to each purchaser's experience:

> [T]he claim that Freshmates is not "flushable" because it clogged Mr. Belfiore's pipes is unique to Mr. Belfiore's actual experience; plaintiff has not shown (and could not show) through common evidence that the product is actually "non-flushable" for everyone. Mr. Belfiore's experience is not typical of the majority of purchasers, many of whom have been using the product for years, and for whom the product has always been fully "flushable."

Def.'s Mem. of Law in Opp'n to Pl.'s Mot. for Class Cert., Mar. 27, 2015, ECF No. 81 ("Def.'s

Opp'n"), at 7.

When pushed to provide a definition, counsel for defendant stated: "what Procter & Gamble knows consumers believe [flushable] to mean is that it will not cause problems in their home system." Class Cert. Hr'g Tr. 46:16–19 (Henn).

### D. *According to Defendant's Experts*

Dr. Darius Sabaliunas, Associate Director of Global Products Stewardship for defendant, offered a specific definition with respect to a consumer's understanding of "flushable":

> A:    . . . If you ask a consumer, consumer's understanding would be, well, *it has to clear the toilet. It has to clear the drainline. It has to successfully leave their home*. Probably that is what they care about. P&G looks beyond that. And we agree, obviously, with the consumer and *we have tests to show that wipes do just that, you know, they're compatible with home systems*. But then also we have tests that ensure compatibility of flushable products with municipal sewer systems, too, as well as treatment plants.
>
> Q:    How do you measure whether a product is flushable?
>
> A:    We use [the INDA] guidelines . . . .

Science Day Part I Hr'g Tr., June 19, 2015 ("Science Day Part I), 190:8–18 (Sabaliunas) (emphasis added).

Dr. Sabaliunas reiterated this point in a declaration, tying the definition of flushable to the capacity of the product to comply with industry standards and tests:

> The tests described in the INDA [Association of the Nonwoven Fabrics Industry] guidelines measure how a product performs in a consumer's toilet and household pipe system, its compatibility with wastewater conveyance, treatment, reuse, and disposal systems, and whether the product is unrecognizable in effluent and digested sludge that is generated in the normal course by wastewater treatment facilities. Products that pass the battery of flushability tests described in these INDA guidelines may be labeled as "flushable."

Decl. of Darius Sabaliunas, Ph.D., in Supp. of Def. the Procter & Gamble Co.'s Mot. to Deny Class Cert., Feb. 27, 2015, ECF No. 68, at 2–3; *see also* Def.'s Opp'n 9 n.5 ("[I]t is undisputed

that Freshmates passes all of the tests required for the product to be labeled as 'flushable' under these [INDA] guidelines.").  He also stated that "flushable products do not have to fully disintegrate in home drain lines for them to be compatible with toilet and drain lines and not to clog them."  Science Day I 208:1–4 (Sabaliunas).

E.  *According to Other Experts*

Daniel H. Zitomer, an environmental engineer who had served as a consultant for wastewater districts, proffered a broad definition that extended to municipal sewage and wastewater treatment systems.

> Q:      When asked at your recent deposition what flushable means . . . [y]ou said that *when used appropriately and flushed, it shouldn't cause any impairments of the function or damage to plumbing system, its sewerage system or the treatment system.*
>
> Is that right?
>
> A:      Yes, that's correct.

Science Day Part I 48:12–20 (Zitomer) (emphasis added) (Plaintiff's attorney examined Dr. Zitomer, who was called as an expert witness by the plaintiff in *Kurtz v. Kimberly-Clark Corp. & Costco Wholesale Corp.*, No. 14-CV-1142, a separate litigation.  The attorney for defendant declined to examine Dr. Zitomer).

Jeffrey Scott Hurley, Vice President for Nonwovens for Nice-Pak Products Inc., a competitor of defendant, defined "flushable," in terms of a consumer's need, as being able to pass through one's property—a definition that, according to him, included a golfball:

> Q:      [W]hat is your definition of flushable?
>
> A:      Say the consumer, because I'm not wastewater, I'm a consumer, that flushable is the product is passing out through my house and it's off my property.
>
> Q:      *So a paper towel would be flushable* then?

A:      *To a consumer, yes.*

Q:      *A golf ball?*

A:      *A wristwatch, golf ball, Matchbox car.*

Science Day Part I 178:16–23 (Hurley) (emphasis added) (Mr. Hurley served as an expert for

defendant Costco Wholesale Corporation in *Kurtz v. Kimberly-Clark Corp. & Costco Wholesale*

*Corp.*, No. 14-CV-1142, a separate litigation; he provided the testimony in response to cross-

examination by plaintiff's attorney in the instant case).

### F. *According to The Association of the Nonwoven Fabrics Industry & European Counterpart*

In June 2008, the Association of the Nonwoven Fabrics Industry ("INDA"), an

organization of United States companies in the "nonwoven/engineered fabrics industry," and the

European Disposables and Nonwovens Association ("EDANA"), its European counterpart,

formulated the first edition of guidelines that assessed the flushability of nonwoven consumer

products. *See* Notice of Filing of Ex. 26A–26I by The Procter & Gamble Co., at Ex. 26A,

Guidelines for Assessing the Flushability of Disposable Nonwoven Prod., Third Edition, June

22, 2015, ECF No. 108 ("INDA Guidelines"), at 3–4.

The defendant is an active member of INDA. It approached the organization suggesting

the establishment of a flushability task force. *See* Science Day Part I 191:10–23 (Sabaliunas).

The third edition of the flushability guidelines, released in June 2013, addresses

nonwoven product's effect on both the consumer and wastewater treatment systems. For a

product to be "operationally defined as flushable," it must:

> Clear toilets and properly maintained drainage pipe systems when
> the supplier[']s recommended usage instructions are correctly
> followed;

28

Pass[] through wastewater conveyance systems and [be] compatible with wastewater treatment, reuse and disposal systems without causing system blockage, clogging or other operational problems; and

Is unrecognizable in effluent leaving onsite and municipal wastewater treatment systems and in digested sludge from wastewater treatment plants that are applied to soil.

INDA Guidelines *supra*, at 19.

A fourth edition of the guidelines is under consideration. Science Day Part II 15:3–5.

### G. *According to Federal Trade Commission*

As already stated in *supra* Part III.B., the Federal Trade Commission, in a proposed consent agreement with a competitor of the defendant, provided some guidance on what it then believed may be an appropriate definition of "flushable":

disperses in a sufficiently short amount of time after flushing to avoid clogging, or other operational problems in, household and municipal sewage lines, septic systems, and other standard wastewater equipment.

*In the Matter of Nice-Pak Products, Inc., Agreement Containing Consent Order*, No. 132-3272, May 18, 2015, https://www.ftc.gov/system/files/documents/cases/150518nice-pakorder.pdf ("Proposed FTC Agreement").

### H. *According to Dictionaries*

Dictionaries offer differing definitions of "flushable." *See, e.g.*, *Flushable*, Merriam-Webster, http://www.merriam-webster.com (last visited Sept. 16, 2015) ("suitable for disposal by flushing down a toilet"); *Flushable*, Oxford English Dictionary (3rd ed. 2007), *available at* http://www.oed.com ("[D]esigned to be flushed down a toilet after use. Also more generally: of a size which admits of disposal down a toilet."); *Flushable*, Webster's New World College

29

Dictionary (5th ed. 2014), *available at* http://www.yourdictionary.com/flushable#websters ("able to be flushed down a toilet without causing an obstruction").

## I. *Lack of Consumer Surveys*

No scientifically-designed survey has been offered indicating consumer understanding of the term. A well-designed survey would be expensive. There has been no suggestion that the class representative is prepared to pay for such an inquiry.

## V. Procedural History and Instant Motions

This case's procedural history through March 20, 2015 is outlined in the court's memorandum and order denying defendant's motion to dismiss the complaint. *See* Mem. & Order, Mar. 20, 2015, ECF No. 78.

Plaintiff now moves to certify a class action, pursuant to subsections (b)(2) and (b)(3) of Federal Rule of Civil Procedure 23. Mot. to Certify Class by Anthony Belfiore, Feb. 27, 2015, ECF No. 58; *see also* Pl.'s Mem.; Pl.'s Reply Mem. of Law in Supp. of Mot. for Class Cert., Apr. 30, 2015, ECF No. 90 ("Pl.'s Reply"). The proposed class is defined as:

> . . . all persons and entities who purchased Charmin Freshmates in
> the State of New York between May 23, 2011 and May 23, 2014[.]

Pl.'s Mem. 1. He seeks to enjoin defendant from labeling Freshmates as "flushable" and "safe for sewer and septic systems." Class Cert. Hr'g Tr. 8:11–12:2. He also seeks statutory damages of $50 per purchase based on a premium price theory. *Id.* at 9:19–20; *see also* N.Y.G.B.L. § 349 (a violation of § 349 permits a recovery of "actual damages or fifty dollars, whichever is greater [per transaction]").

Defendant moves to deny class certification. Mot. to Deny Class Cert. by The Procter & Gamble Co., Feb. 27, 2015, ECF No. 59 ("Def.'s Mot."); Def.'s Mem. of Law in Supp. of its Mot. to Deny Class Cert., Feb. 27, 2015, ECF No. 60 ("Def.'s Mem."). Plaintiff opposes. Pl.'s

Mem. of Law in Opp'n to Def.'s Mot. to Deny Class Cert., Mar. 27, 2015, ECF No. 80 ("Pl.'s Opp'n").

On June 19, 2015 and July 21, 2015, the court conducted evidentiary hearings on the technology underlying "flushables." *See* Science Day Part I; Science Day Part II. The hearings were conducted in conjunction with a separate case before this court involving "flushable" wipes manufactured and sold by other defendants. *Id.*; *see supra* Part III.A.1.

Prior to the hearings, expert reports and affidavits were submitted. They included: proposed methods for calculating damages on a class-wide basis; evaluation of plaintiff's pipes by a master plumber; and discussions by defendant's representatives of (1) the company's market research on why consumers purchase "flushable" wipes (besides flushability), (2) defendant's sales practices, and (3) defendant's own testing of the "flushability" of its wipes.

Expert testimony was received. *See generally* Science Day Part I; Science Day Part II. Videos were presented demonstrating the passage—and purported disintegration—of wipes made by various manufacturers through household sewage systems, as simulated under laboratory conditions. *Id.*

No study was conducted or offered addressing *consumers'* understanding of the term "flushable" or "safe for sewer and septic systems."

Oral arguments on the respective motions to grant and deny class certification were heard on August 12, 2015. *See generally* Class Cert. Hr'g Tr. Decision was reserved. *Id.*

Subsequently, the parties were directed to provide briefs with respect to the application of N.Y. C.P.L.R. § 901(b) (the State's consumer protection statute limiting recovery in class actions) to the instant case, in light of *Shady Grove Orthopedic Associates, P.A. v. Allstate Ins. Co.*, 559 U.S. 393 (2010). *See* Order, Aug. 12, 2015, ECF No. 124. *Shady Grove* held that §

901(b) was a procedural provision not applicable in a case pending before the federal court.  On August 26, 2015, the parties submitted the requested supplemental briefing.  *See* ECF Nos. 129–130.

Next, on August 31, 2015, the court ordered the parties to submit briefing on the potential applicability of the primary jurisdiction doctrine.  Order to File & Docket Supp. Briefs, Aug. 31, 2015, ECF No. 135.  Briefs were filed with plaintiff opposing application of the doctrine and defendant dubitante.  *See* ECF No. 138–39.

On September 17, 2015, the parties in this and five related cases were ordered to advise of any additional cases filed in this court involving "flushable" wipes.  Counsel were also ordered to advise the court: (1) if they serve as counsel in any case filed in another court that involves "flushable" wipes; and (2) if their clients are parties to any case filed in another court that involves "flushable" wipes.  Order, Sept. 18, 2015, ECF No. 145.  In response, the parties submitted letters.  *See* ECF Nos. 146–148; *see also Letter from Mark S. Reich Esq., Robbins Geller Rudman & Dowd LLP*, Sept. 18, 2015, 14-CV-1142, ECF No. 177; *Letter from Eamon P. Joyce Esq., Sidley Austin LLP*, Sept. 21, 2015, 14-CV-1142, ECF No. 180; *Letter from David E. Sellinger Esq., Greenberg Traurig LLP*, Sept. 25, 2015, 15-CV-4579, ECF No. 16; *Letter from Paul J. Rutigliano*, Sept. 30, 2015, 15-CV-4579, ECF No. 17.

## VI.   Expert Reports

### A.  *Plaintiff's Expert: Colin B. Weir*

Plaintiff introduced an expert report from Colin B. Weir, Vice President of Economics and Technology, Inc., "a research and consulting firm specializing in economics, statistics, regulation and public policy."  Decl. of Colin B. Weir in Supp. of Pl.'s Mot. for Class Cert., Feb. 27, 2015, ECF No. 62-3 ("Weir Expert Report"), at 1; Rebut. Decl. of Colin B. Weir in Supp. of

Pl.'s Mot. for Class Cert., Apr. 29, 2015, ECF No. 89-3 ("Weir Rebuttal").  Mr. Weir has

provided expert testimony before federal and state courts, the Federal Communications

Commission, and state regulatory commissions.  Weir Expert Report ¶ 1.

      Mr. Weir's hedonic regression analysis was recently accepted in the Southern District of

New York in order to demonstrate a price premium associated with the specific representation

"50% thicker" on the defendant's seed packaging.  *In re Scotts EZ Seed Litig.*, 304 F.R.D. 397,

413–14 (S.D.N.Y. 2015).  His calculation of a price premium, attributable to a challenged 0%

olive oil dilution, was also accepted in the Southern District of New York in *Ebin v. Kangadis*

*Food Inc.*, 297 F.R.D. 561, 571 (S.D.N.Y. 2014) (calculating price premium based on a

difference in value calculation).

      Here, Mr. Weir proposed three damages models: full compensatory damages, statutory

price premium damages, and statutory damages.  *See generally id.* ¶¶ 12–53.  His price premium

model is relevant to establishing injury; his statutory model is relevant to calculating damages.

      In order to ascertain a price premium, Mr. Weir proposes using hedonic regression

theory, a tool that measures the value of various product attributes, in order to demonstrate the

existence of, and to isolate the amount of, a price premium attributable to defendant's use of

"flushable" in merchandising.  *Id.* ¶ 15.  His analysis would rely on evidence gleaned from

defendant's own business records, industry resources and independent market research data

obtained from companies like Nielsen and Information Resources, Inc.  *Id.* ¶¶ 13–52.  In his

report and rebuttal, Mr. Weir presents the regression function in detail and provides a

"preliminary" list of product attributes upon which he would rely.  *See id.* ¶¶ 19–25, 33–36; Weir

Rebuttal ¶¶ 34, 39–40.  He describes the "iterative" process that can be used to determine the

"best regression specification before finalizing the results."  Weir Expert Report ¶ 34.

In the alternative, Mr. Weir presents in a footnote two different methods for determining the price premium:

> It would also be possible to evaluate the difference in price attributable to the 'flushable' label . . . using statistical survey techniques such as *contingent valuation* (a representative survey technique that asks people to directly report their willingness to pay to obtain a specific good or product attribute, or willingness to accept to give up a good or product attribute) or *conjoint analysis* (a representative survey technique where survey panelists are confronted with various choices of product attributes, prices, and other alternatives, and asked either to rank their preferences, or to choose the most preferred attribute or combination thereof) the results of which permits an economist to analyze the value of various product attributes.

Weir Expert Report ¶ 14, n. 7 (emphasis added).

To determine statutory damages of fifty dollars per purchase, Weir proposes a simple mathematical calculation. *Id.* ¶ 53.

### B. *Defendant's Expert: Carol A. Scott, Ph.D.*

Defendant submitted two expert reports from Carol A. Scott, Ph.D., professor emeritus of marketing at the Anderson Graduate School of Management, University of California, Los Angeles. Decl. of Carol A. Scott, Ph.D. Feb. 27, 2015, ECF No. 69 ("Scott Decl. I"); Decl. of Carol A. Scott, Ph.D., Mar. 27, 2015, ECF No. 82 ("Scott Decl. II").

Dr. Scott calls hedonic regression "not an 'ideal' method to determine a price premium." Scott Decl. II ¶¶ 10–14, 20. Assuming it is suitable, she challenges Mr. Weir's proposal for not providing sufficient details about the model or defining parameters for the: (1) dependent variable (typically the price of the product); (2) set of independent or predictor variables (the product attributes); and (3) set of brands against which these variables will be analyzed. *Id.* ¶ 15.

She also questions the differences in the format of several of the available datasets. *Id.* ¶¶ 16, 26–42.

## VII.   New York General Business Law § 349

Section 349 of New York's General Business Law declares consumer fraud unlawful:

> Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful.

N.Y.G.B.L. § 349(a).

To establish a *prima facie* case under § 349, "a plaintiff must demonstrate that (1) the defendant's deceptive acts were directed at consumers, (2) the acts [we]re misleading in a material way, and (3) the plaintiff has been injured as a result." *In re Scotts*, 304 F.R.D. at 409 (citing *Maurizio v. Goldsmith*, 230 F.3d 518, 521 (2d Cir. 2000)).  Plaintiff must show that the act complained of was likely to "mislead a *reasonable consumer* acting reasonably under the circumstances." *Spagnola v. Chubb Corp.*, 574 F.3d 64, 74 (2d Cir. 2009) (per curiam) (emphasis added; citation omitted).  Courts "view each allegedly misleading statement in light of its context on the product label or advertisement as a whole." *Delgado v. Ocwen Loan Servicing, LLC*, No. 13-CV-4427, 2014 WL 4773991, at *8 (E.D.N.Y. Sept. 24, 2014) (citation omitted). "The entire mosaic" is "viewed rather than each tile separately." *Time Warner Cable, Inc. v. DIRECTV, Inc.*, No.6-CV-14245, 2007 WL 1138879, at *4 (S.D.N.Y. Apr. 16, 2007) (citation omitted).  The "issue may be a question of law or of fact as individual cases require." *Delgado*, 2014 WL 4773991, at *8 (citing *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 623 N.Y.S.2d 529, 533 (1995).

"Intent to defraud and justifiable reliance by the plaintiff are *not* elements of the statutory claim." *Oscar v. BMW of N. Am., LLC*, 274 F.R.D. 498, 512 (S.D.N.Y. 2011) (emphasis added)

(citing *Small v. Lorillard Tobacco Co.*, 94 N.Y.2d 43, 54 (1999)); *In re Avon Anti-Aging Skincare Creams & Prods. Mktg. & Sales Practices Litig.*, No. 13-CV-150 JPO, 2015 WL 5730022, at *7 (S.D.N.Y. Sept. 30, 2015) ("Plaintiffs need not show justifiable reliance").

But "proof that a material deceptive act or practice caused actual, although not necessarily pecuniary, harm is required to impose compensatory damages." *Oscar* at 512. (citation omitted).

A violation of New York General Business Law § 349 permits an action to "enjoin such unlawful act or practice [and] an action to recover actual damages or *fifty dollars [per transaction*], whichever is greater." N.Y.G.B.L. § 349(h) (emphasis added). The provision also provides for multiplication of actual damages in case of willful violations:

> The court may, in its discretion, increase the award of damages to an amount not to exceed three times the actual damages up to one thousand dollars, if the court finds the defendant willfully or knowingly violated this section. The court may award reasonable attorney's fees to a prevailing plaintiff.

*Id.*

"Section 349(h) is substantially modelled on the Federal Trade Commission Act."

*Genesco Entm't, a Div. of Lymutt Indus., Inc. v. Koch*, 593 F. Supp. 743, 752 (S.D.N.Y. 1984)

## VIII.    N.Y. C.P.L.R. § 901(b)'s Limits on Predetermined Damages and *Shady Grove*

### A. *Erie*

When a federal district court exercises diversity jurisdiction, "[e]xcept in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the state." *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). If there appears to be a conflict between state and federal law, it must be determined "whether, when fairly construed, the scope of [the federal rule] is 'sufficiently broad' to cause a 'direct collision' with the state law or, implicitly, to 'control the issue' before the court, thereby leaving no room for the

operation of that law." *Burlington N. Ry. Co. v. Woods*, 480 U.S. 1, 4–5 (1987) (quoting *Walker v. Armco Steel Corp.,* 446 U.S. 740, 749, and n. 9 (1980)).

If a conflict is present, the federal substantive rule "must then be applied if it represents a valid exercise of Congress' rulemaking authority . . . ." *Id.* at 5. A valid exercise does not include a rule that "abridge[s], enlarge[s], or modif[ies] any substantive right." 28 U.S.C. § 2072(b).

If no conflict is present, the court must determine whether the state law is procedural or substantive. "It is well-settled that when a court sits in diversity jurisdiction, it must apply state substantive law and federal procedural law." *Bonime v. Avaya, Inc.*, No. 06-CV-1630, 2006 WL 3751219, at *2 (E.D.N.Y. Dec. 20, 2006), *aff'd*, 547 F.3d 497 (2d Cir. 2008), *abrogated on other grounds by Giovanniello v. ALM Media, LLC*, 726 F.3d 106, 113 (2d Cir. 2013) (quoting *Erie Ry. Co. v. Tompkins*, 304 U.S. 64 (1938)). This determination is made with the dual aims of *Erie* in mind: (1) to "obtain results substantially similar to those reached by state courts considering the same cause of action;" and (2) to "avoid application of federal law if that application would significantly encourage forum shopping by prospective out-of-state litigants." *Morse v. Elmira Country Club*, 752 F.2d 35, 37 (2d Cir. 1984).

*Erie* problems can be subtle. In one sense, procedural rules are almost always substantive in effect. If a procedural rule tends to favor plaintiffs, the substantive law more adversely affects defendants by making it easier to recover. The substantive effect is therefore substantial: potential defendants should be more likely to avoid the complained of conduct.

If there is no available procedure to enforce the substantive law, from the plaintiff's and the defendant's point of view, there is no substantive law. *See McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 219 (2d Cir. 2008) ("not every wrong can have a legal remedy"), *abrogation on*

37

*other grounds recognized by Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128 (2d Cir. 2015); *cf.*

Essay, *The Role of Judges in A Government of, by, and for the People: Notes for the Fifty-Eighth*

*Cardozo Lecture*, 30 Cardozo L. Rev. 1, 166 (2008) ("It is important to recall the central theme

of our legal system: *ubi jus, ibi remedium*—every violation of a right should have a remedy in

court.").  This is an indirect effect.

A direct division between substance and procedure exists where the rule is substantive

because it is designed to control conduct in the real world of defendants.  Methods of enforcing

that legal rule are procedural.  The Federal Rules of Civil Procedure are designed to be

transsubstantive, that is to say, their effect should be the same whatever substantive law they are

being used to enforce.

### B.  *N.Y. C.P.L.R. § 901(b) and Federal Rule of Civil Procedure 23*

New York law prohibits the maintenance of class actions seeking to recover "a penalty,

or minimum measure of recovery created or imposed by statute," unless that statute explicitly

authorizes recovery through a class action.  N.Y. C.P.L.R. § 901(b).  Federal Rule of Civil

Procedure 23, which sets forth the requirements for maintaining a class action in federal court,

contains no such restriction.  *See* Fed. R. Civ. P. 23.

N.Y. C.P.L.R. § 901(b) reads as follows (emphasis added):

> 901. Prerequisites to Class Actions
> . . .
> (b) Unless a statute creating or imposing a penalty, or a minimum
> measure of recovery specifically authorizes the recovery thereof in
> a class action, *an action to recover a penalty, or minimum measure*
> *of recovery created or imposed by statute may not be maintained*
> *as a class action.*

The majority of courts that have considered the interaction between § 901(b) and Rule 23

have concluded that the two do not conflict.  *See, e.g.*, *Holster v. Gatco, Inc.*, 485 F. Supp. 2d

179, 185 n. 3 (E.D.N.Y. 2007), *aff'd*, 618 F.3d 214 (2d Cir. 2010), *abrogated on other grounds by Giovanniello*, 726 F.3d at 113 ("the Court finds . . . that § 901(b) is a matter not covered by Federal Rule of Civil Procedure 23"); *Leider v. Ralfe*, 387 F. Supp. 2d 283, 290 (S.D.N.Y. 2005) (finding "no collision between Fed. R. Civ. P. 23 and § 901(b)"); *Dornberger v. Metro. Life Ins. Co.*, 182 F.R.D. 72, 84 (S.D.N.Y. 1998), *as amended* (Jan. 5, 1999) ("Whereas this Court is bound by Fed. R. Civ. P. 23 in this action, the strictures of New York's C.P.L.R. § 901(b) do not contravene any federal rule."); *cf. Sperry v. Crompton Corp.*, 863 N.E.2d 1012 (2007) (treble damages not recoverable in a class action brought under the Donnelly Act, N. Y. G. B. L. § 340, because the damage provision was a penalty for the purposes of N.Y. C.P.L.R. § 901(b) intended to deter antitrust behavior); New York Consolidated Law Service, Civil Practice Annual, *formerly* Clevenger's Annual Practice of New York, Civil Law and Rules 901, § 902 (2015).

Finding no conflict, courts have addressed the question of whether § 901(b) is procedural or substantive for federal litigation. "[T]he bulk of cases to address the applicability of N.Y. C.P.L.R. § 901(b) have decided the statute is substantive and applies with equal force in federal litigation." *Leider*, 387 F. Supp. 2d at 291–92 (collecting cases); *see also Holster*, 485 F. Supp. 2d at 186 (holding § 901(b) is substantive); *Bonime*, 2006 WL 3751219, at *3 (collecting cases; concluding that "section 901(b) is a substantive provision"); *Gordon v. Kaleida Health*, No. 08-CV-378S, 2008 WL 5114217, at *10 (W.D.N.Y. Nov. 25, 2008), *order amended on reconsideration*, No. 08-CV-378S, 2009 WL 4042929 (W.D.N.Y. Nov. 19, 2009) ("since 901(b) is a substantive rule, 901(b) applies to the facts of this case pursuant to *Erie*").

This conclusion—of the substantive nature of § 901(b)—seemed to be necessary in light of *Erie*'s twin dictates. *See Morse*, 752 F.2d at 37 (*Erie* instructs courts to "obtain results substantially similar to those reached by state courts considering the same cause of action," and

39

to "avoid application of federal law if that application would significantly encourage forum shopping by prospective out-of-state litigants").

Where § 901(b) would bar recovery of penalty damages in New York State class actions, it should, proceduralists agreed, also bar recoveries in federal court class actions. *Cf., e.g.*, Thomas A. Dickerson, *Class Actions*, *in* Harold L. Korn, Arthur R. Miller et al., New York Civil Practice: C.P.L.R. § 901.29 (David L. Ferstendig ed., 2d ed. 2015) ("In an effort to avoid the impact of CPLR § 901(b) some class actions brought on behalf of New York State residents have been brought in the United States District Court for the Eastern and Southern Districts of New York under Fed R. Civ. P. 23 which has no such prohibition. Perhaps on the basis of comity and to discourage forum shopping, the federal courts have routinely denied class certification and referred to C.P.L.R. § 901(b)"). Excluding punitive or fixed damages in class actions is designed to protect New York businesses from destructive awards where little damage was done to consumers. *Id.* ("It is obvious that by including the penalty exception in CPLR 901(b), the Legislature declined to make class actions available when individual plaintiffs were afforded sufficient economic encouragement to institute actions (through statutory provisions awarding something beyond or unrelated to actual damages) unless a statute expressly authorized the option of class action status." (citation omitted)).

This conclusion that § 901(b) is substantive in its effect is consistent with the New York State policy underlying § 901(b), a factor which federal courts should consider when interpreting Federal Rules. *See Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 418 (2010) (Stevens, J., concurring) ("federal rules must be interpreted with some degree of 'sensitivity to important state interests and regulatory policies'") (quoting *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427 n. 7 (1996)); *see also id.* at 443 (Ginsburg, J., dissenting)

("Our decisions instruct over and over again that, in the adjudication of diversity cases, state interests . . . warrant our respectful consideration.").

The § 901(b) limit was designed by New York legislators to prevent plaintiffs from obtaining statutory damages through the class action mechanism, thereby protecting defendants from "annihilating punishment." V. Alexander, Practice Commentaries, C 901:11 (McKinney) ("The Legislature added the provision, apparently fearing that class judgments awarding statutory penalty-type damages to each member of the class could result in "annihilating punishment" of the defendant."); *see also* 2 Harold L. Korn, Arthur R. Miller et al., New York Civil Practice § 901.22 (1997) (prohibition intended to "protect businesses against catastrophic judgments"). Permitting a class action to go forward in federal court where it would otherwise be barred by § 901(b) in state court could subject defendants to the harsh punishment the New York legislature sought to avoid.

The legislature's decision to mark § 901(b) with a "§" symbol for statute—as opposed to "R" for Rule—reflected its intention to exercise control as a matter of policy over the section instead of ceding control to the judiciary. *See* 1 Harold L. Korn, Arthur R. Miller et al. New York Civil Practice, Preface (1995) ("[T]he rules in the CPLR will be amended by the judicial conference . . . and the sections in the CPLR will be amended by the action of the Legislature and Governor.").

Before the decision in *Shady Grove*, it seemed clear that § 901(b) should be treated as a New York substantive provision that applies with equal force in federal court.

### C. *Shady Grove*

The Supreme Court considered the interaction between Federal Rule of Civil Procedure 23 and § 901(b) in *Shady Grove*, 559 U.S. at 393. In that case, a plurality of the Supreme Court

disagreed with the consensus among lower courts.  The Court concluded that § 901(b) and Rule 23 *do* conflict, and that Rule 23 represents a lawful exercise of Congress's procedural rulemaking power.  *Id.* at 399–401.  Although a five-Justice majority agreed with this conclusion, the majority did not agree on why this was the case.

*Shady Grove* involved an orthopedic practice's claim against Allstate Insurance Company for payment on a patient's insurance policy.  *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 466 F. Supp. 2d 467, 470 (E.D.N.Y. 2006).  Pursuant to section 5106 of the New York Insurance Law and Part 65-3 of Title 11 of the Official Compilation of Codes, Rules and Regulations of the State of New York, Allstate was required to pay or deny Shady Grove's claim within thirty days.  Payments made after thirty days would incur a statutory two percent interest penalty.  *Id.*

When Allstate failed to make timely payment, Shady Grove and its patient commenced an action in federal court against Allstate on behalf of themselves and all others similarly situated.  *Id.*  The proposed class included "all persons to whom Allstate owes interest under N.Y. Ins. Law § 5106 and Part 65-3 of Title 11 of the [Official Compilation of Codes, Rules and Regulations of the State of New York] with respect to claims for first-party no fault benefits." *Id.*

Allstate moved to dismiss the complaint on the grounds that, *inter alia*, N.Y. C.P.L.R. § 901(b) barred Shady Grove's claim.  Section 901(b), Allstate argued, prohibited plaintiffs from maintaining a class action that sought the statutorily imposed interest penalty of New York Insurance Law § 5106 because that provision does not authorize class action recovery for violations.  *See* Mem. of Law in Supp. of Def. Allstate Ins. Co.'s Mot. to Dismiss Pursuant to

Fed. R. Civ. P. 12(b)(6), *Shady Grove Orthopedic Assoc., P.A. v. Allstate Ins. Co.*, 466 F.Supp. 2d 467 (E.D.N.Y. 2006), at 10–12.

The district court granted Allstate's motion, rejecting plaintiffs' argument that § 901(b) is procedural and thus inapplicable in federal court. It held:

> [w]hereas this Court is bound by [Rule 23] in this action, the strictures of [§ 901(b)] do not contravene any federal rule. This situation does not warrant an invocation of the Supremacy Clause or a discussion of the overlapping scope of [§ 901] and Rule 23. It would be patently unfair to allow a plaintiff an attempt at recovery in federal court for a state law claim that would be barred in state court.

*Id.* at 472 (quoting *Dornberger v. Metro. Life Ins. Co.*, 182 F.R.D. 72, 84 (S.D.N.Y. 1998)).

The Court of Appeals for the Second Circuit affirmed the district court's ruling, finding plaintiffs' claims barred by § 901(b). It first inquired whether Rule 23 conflicts with § 901(b). The court agreed with "[e]very district court to consider this question in any detail," finding "that there is no conflict." *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 549 F.3d 137, 143 (2d Cir. 2008). In reaching this conclusion, the court explained that § 901(b) "prohibits class actions to recover a penalty or a minimum measure of recovery absent specific statutory authorization. There is no analogue to CPLR 901(b) in Rule 23." *Id.* It analogized § 901(b) "to a statute of limitations, which is substantive for *Erie* purposes." *Id.*

Examining the purpose of § 901(b), it noted that "in the *Erie* context, a Federal Rule should be interpreted 'with sensitivity to important state interests and regulatory policies.'" *Id.* at 144 (quoting *Gasperini*, 518 U.S. at 427 n. 7). The court explained that

> the purpose behind CPLR 901(b) is to offset the deterrent effect of statutory penalties by eliminating the class action device as a means of enforcement of those penalties. CPLR 901(b) should be interpreted as part of the statutory interest penalty scheme, because it serves the state interest of offsetting that penalty. Allowing

plaintiff to pursue its claims in federal court as a class action would
circumvent this state policy.

*Id.* at 144–45.

After concluding that there is no conflict between Rule 23 and § 901(b), the Court of

Appeals for the Second Circuit analyzed the impact of § 901(b)'s effect on the aims of *Erie*. It

"agree[d] with the overwhelming majority of district courts that have concluded that CPLR §

901(b) is a substantive law that must be applied in the federal forum, just as it is in state court."

*Id.* at 145. This result is necessary, it noted, because "[a]ny other conclusion would contravene

the mandates of *Erie* by allowing 'plaintiffs to recover on a class-wide basis in federal court

when they are unable to do the same in state court.'" *Id.* (quoting *Leider v. Ralfe*, 387 F. Supp.

2d 283, 291 (S.D.N.Y. 2005)). The court also pointed out that "[a] failure to apply CPLR 901(b)

would clearly encourage forum-shopping." *Id.* (quotation omitted).

The Supreme Court granted *certiorari* and reversed in a plurality opinion. Four-Justice's

—with one concurrence—concluded that Federal Rule 23 and § 901(b) do conflict and that, in a

federal court, the federal rule governs:

> Rule 23 provides a one-size-fits-all formula for deciding the class
> action question. Because § 901(b) attempts to answer the same
> question—*i.e.*, it states that Shady Grove's suit 'may *not* be
> maintained as a class action' (emphasis added) because of the
> relief it seeks—it cannot apply in diversity suits unless Rule 23 is
> ultra vires.

*Shady Grove*, 559 U.S. at 399.

The Court rejected the Court of Appeal's conclusion that Federal Rule 23 and § 901(b)

do not conflict because they address different issues, holding that "[b]oth are preconditions for

maintaining a class action." *Id.* It rejected the argument that the structure of § 901 demonstrates

"that Rule 23 addresses only certifiability." *Id.* at 400. The Court held that "[b]oth of § 901's

subsections undeniably answer the same question as Rule 23: whether a class action may proceed for a given suit." *Id.* at 401. After concluding that Rule 23 and § 901(b) conflict, the majority splintered on analysis.

Writing for four Justices, Justice Scalia noted that "Congress has undoubted power to supplant state law, and undoubted power to prescribe rules for the courts it has created, so long as those rules regulate matters rationally capable of classification as procedure." *Id.* at 406 (Scalia, J., plurality op.) (citation omitted). Because of this power, Justice Scalia reasoned, the only question that matters is not whether the state law at issue is substantive or procedural, but whether the federal rule is. *Id.* at 409 (rejecting the parties' arguments about whether § 901(b) is substantive or procedural, saying that it "*makes no difference*"); *id.* at 410 ("In sum, it is not the substantive or procedural nature or purpose of the affected state law that matters, but the substantive or procedural nature of the Federal Rule.").

Rule 23, according to Justice Scalia, is procedural because it "neither change[s] plaintiffs' separate entitlements to relief nor abridge[s] defendants' rights; [it] alter[s] only how the claims are processed." *Id.* at 408. Therefore, Rule 23 "is authorized by § 2072 and is valid in all jurisdictions, with respect to all claims, regardless of its incidental effect upon state-created rights." *Id.* at 410. That the result might be a vastly greater damage award by a federal court as compared to that of a New York State court applying a New York consumer protection statute was not relevant under Justice Scalia's analysis.

Justice Stevens concurred with the plurality that § 901(b) is a procedural rule which is displaced by Rule 23, but also with the essence of the approach in Justice Ginsburg's dissent. He acknowledged that there may be some state procedural rules that "function as part of the State's definition of substantive rights and remedies." *Id.* at 416–17 (Stevens, J., concurring).

He began his analysis with the proposition that Rule 23 governs the determination of whether to certify a class action in federal court. *Id.* at 430. "Rule 23, therefore, must apply unless its application would abridge, enlarge, or modify New York rights or remedies." *Id.* Such a finding, Justice Stevens explained, requires more than "[t]he mere possibility that a federal rule would alter a state-created right"; rather, "[t]here must be little doubt." *Id.* at 432.

In Justice Stevens' view, there was insufficient evidence to make such a finding of alternation of a state-created right. Rather, because the text of § 901(b) applies to claims based on federal and other states' laws, the statute does not define New York's rights or remedies. *Id.* Justice Stevens rejected the dissent's conclusions concerning § 901(b)'s legislative history. In his opinion, the legislative history of § 901(b) "reveals a classically procedural calibration" akin to setting filing fees or briefing deadlines. *Id.* at 435. He concluded that Rule 23, rather than § 901(b) should govern class certification in the *Shady Grove* case in federal courts. *Id.* at 436.

The dissent's analysis was in line with prior court decisions and secondary authority. It begins with the preliminary question: "Is this conflict really necessary?" *Id.* at 437 (Ginsburg, J., dissenting). If not, the Rules of Decision Act "directs federal courts, in diversity cases, to apply state law when failure to do so would invite forum shopping and yield markedly disparate litigation outcomes." *Id.* at 439.

Justice Ginsburg argues that a conflict resulting in the displacement of state law should only be found when a federal rule is "'sufficiently' broad so as 'to control the issue before the court, thereby leaving no room for the operation of that [state] law.'" *Id.* (quoting *Burlington N. Ry. Co.* 480 U.S. at 4–5). In making this determination, "federal courts have been cautioned by [the Supreme] Court to 'interpre[t] the Federal Rules . . . with sensitivity to important state

interests' . . . and a will 'to avoid conflict with important state regulatory policies.'" *Id.* at 442

(quoting *Gasperini*, 518 U.S. at 427 n. 7 and 438 n. 22).

Interpreting § 901(b) and Rule 23 against this backdrop, the dissent finds that a conflict

does not exist.

> Sensibly read, Rule 23 governs procedural aspects of class litigation, *but allows state law to control the size of a monetary award* a class plaintiff may pursue . . . Section 901(b) responds to an entirely different concern; it does not allow class members to recover statutory damages because the *New York Legislature considered the result of adjudicating such claims en masse to be exorbitant*.

*Id.* at 446–47 (emphasis added). "Any doubt" to the contrary, the dissent submits, "should be

dispelled by [the Court's] *Erie* jurisprudence . . . which counsels us to read Federal Rules

moderately." *Id.* at 450.

Finding no conflict between § 901(b) and Rule 23, the dissent moves on to consider

whether § 901(b) would be "outcome affective." *Id.* at 456; *see also id.* at 452 (evaluating

whether § 901(b) "would have so important an effect upon the fortunes of one or both of the

litigants that failure to [apply] it would be likely to cause a plaintiff to choose the federal court")

(quoting *Hanna v. Plumer*, 380 U.S. 460, 468 n. 9 (1965)). The dissent concludes, in accordance

with prior authority and legislative history, that § 901(b) would substantially impact the outcome

of the case. Thus it should apply in the instant case. *Id.* at 457.

### D. *Shady Grove* Is Binding

Viewed in the context of *Erie*, the terms "procedural" and "substantive" are sometimes

chameleons, whose hue can be reasonably described differently by different observers. *See, e.g.*,

*supra* Part VIII.A. But most proceduralists would probably agree that § 901(b) is substantive,

not procedural, in color. One study claims that *Shady Grove* has already led to undesirable

"substantive" vertical forum shopping. *See* William H.J. Hubbard, *An Empirical Study of the Effect of* Shady Grove v. Allstate *on Forum Shopping in the New York Courts*, 10 J.L. Econ. & Pol'y 151, 171 (2013) (finding "evidence of large shifts in the patterns of original filings and removals in federal courts in New York").

*Shady Grove* undermines the important state substantive policy behind § 901(b). *See supra* Part VIII.B. But it is binding on federal courts, and therefore, in the instant case. *See Bristol Vill., Inc. v. Louisiana-Pac. Corp*., 916 F. Supp. 2d 357, 371 n.5 (W.D.N.Y. 2013) ("Although N.Y. C.P.L.R. 901(b) prohibits class action relief for a statutorily-imposed penalties or minimum damages, the Supreme Court held in *Shady Grove* that the certification requirements of Rule 23 preempted this state law 'procedural' limitation in federal actions."); *Guido v. L'Oreal, USA, Inc*., No. CV 11-1067, 2013 WL 3353857, at *17 (C.D. Cal. July 1, 2013) ("[A]lthough allowing the New York class to pursue statutory damages appears to contravene New York procedural law, this outcome is required under *Shady Grove*.").

It is therefore necessary to perform a Rule 23 analysis on the issue of the effect of § 901(b), if any, on a proposed federal class action. As indicated below, the provision does have an impact on whether there should be a Rule 23 certification. It is one of the factors leading the court in the instant case to refrain from certifying a damages class. *See infra* IX.F.2.b. Once certified, a class action in federal court would not be influenced by § 901(b) under *Shady Grove*.

## IX. Class Action

"[T]he class action is one way of equalizing the power of enfeebled individuals and the powerful entities they confront." Essay, *Notes on Uniformity and Individuality in Mass Litigation*, 64 DePaul L. Rev. 251, 256 (2015). "The policy at the very core of [Federal Rule of Civil Procedure 23] . . . is to overcome the problem that small recoveries do not provide the

incentive for any individual to bring a solo action prosecuting his or her rights. A class action solves this problem by aggregating the relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 617 (quoting *Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 344 (1997)). "Rule 23 class actions are designed to promote efficiency and economy of litigation . . . without sacrificing procedural fairness." *Ackerman v. Coca-Cola Co. & Energy Brands, Inc.*, No. 09-CV-0395, 2013 WL 7044866, at *6 (E.D.N.Y. July 18, 2013) (report and recommendation) (citing among others *Amchem*, 521 U.S. at 614). "[B]y pooling . . . resources, plaintiffs . . . [may also] retain[] more qualified lawyers." Christine P. Bartholomew, *Redefining Prey and Predator*, 80 Brook. L. Rev. 743, 785 (2015) (citation omitted).

"At times, legislatures and courts have expanded the availability of class actions . . . In the last decade, by contrast, we have seen a movement toward contracting the availability of class actions." Essay, *Notes on Uniformity and Individuality in Mass Litigation*, *supra* at 270–71 (2015).

Consumer protection claims are usually suited to class certification. *See Ebin*, 297 F.R.D. at 567; Essay, *The Role of Judges in a Government of, by, and for the People: Notes for the Fifty-Eighth Cardozo Lecture*, 30 Cardozo L. Rev. 1, 177 (2008) (class actions are "essential" for "large groups of people who need to consolidate their power in the courts in order to protect their rights, as well as for the industry, which needs to stop almost endless resource-sapping suits"). But current "[j]udicial treatment" of class actions involving mislabeling of consumer products "is 'inconsistent' at best." Victor E. Schwartz & Cary Silverman, *The Rise of "Empty Suit" Litigation. Where Should Tort Law Draw the Line?*, 80 Brook. L. Rev. 599, 657 (2015) (discussing class actions involving alleged mislabeling of food as "natural").

Courts must conduct a "rigorous analysis" of each prong of Rule 23. *Ackerman*, 2013 WL 7044866, at \*6 (citation omitted); *Jacob v. Duane Reade, Inc.*, 602 F. App'x 3, 5 (2d Cir. 2015) (summary order) (citing *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011)). "[E]vidence, by affidavits, documents, or testimony" must be gathered, *Ackerman*, 2013 WL 7044866, at \*6 (citation omitted), and "factual disputes relevant to each Rule 23 requirement" must be resolved. *Jacob*, 602 F. App'x at 6 (citations omitted).

While it "may be necessary for the court to probe behind the pleadings before coming to rest on the certification question," *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013) (citation omitted), this is *not* a "free-ranging merits inquiry[.]" *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1194–95 (2013). "Merits questions may be considered . . . only to the extent . . . they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.* The overarching purpose is "not to adjudicate the case . . . [but] to select the method best suited to adjudication of the controversy fairly and efficiently.'" *In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06-MD-1175, 2014 WL 7882100, at \*29 (E.D.N.Y. Oct. 15, 2014) (citation omitted), *report and recommendation adopted by In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06-MD-1[1]75, 2015 WL 5093503, at \*1 (E.D.N.Y. July 10, 2015).

Rule 23 should be construed "*liberal[y]* rather than restrictive[ly.]" *Gortat v. Capala Bros.*, 257 F.R.D. 353, 361–62 (E.D.N.Y. 2009) (citing *Marisol A. v. Giuliani*, 126 F.3d 372, 377 (2d Cir. 1997)) (emphasis added).

The "general preference" of the Court of Appeals for the Second Circuit is "*granting* rather than denying class certification." *Gortat*, 257 F.R.D. at 361 (emphasis added). Still, "a district court is afforded broad discretion in determining whether an action should be certified."

*Haynes v. Planet Automall, Inc.*, 276 F.R.D. 65, 73 (E.D.N.Y. 2011) (citations omitted); *accord Parker v. Time Warner Entm't Co., L.P.*, 331 F.3d 13, 28 (2d Cir. 2003); 7AA Charles A. Wright, Arthur R. Miller et al., *Federal Practice and Procedure* § 1785 (3d ed. 2015). The court may "revisit that certification throughout the legal proceedings before the court." *Rikos v. Procter & Gamble Co.*, No. 14-4088, 2015 WL 4978712, at *18 (6th Cir. Aug. 20, 2015) (citation omitted) (emphasis omitted).

The party seeking class certification "bears the burden of establishing by a preponderance of the evidence that each of Rule 23's requirements have been met." *Myers v. Hertz Corp.*, 624 F.3d 537, 547 (2d Cir. 2010); *Levitt v. J.P. Morgan Sec., Inc.*, 710 F.3d 454, 465 (2d Cir. 2013) (same). The pleading burden is the same regardless of whether the court considers a motion to certify or a motion to deny certification. *See, e.g.*, *Spagnola v. Chubb Corp.*, 264 F.R.D. 76, 92 (S.D.N.Y. 2010).

"Federal Rule of Civil Procedure 23(a) permits a case to be litigated as a class action *only* if (1) the class is so *numerous* that joinder of all members is impracticable; (2) there are questions of law or fact *common* to the class; (3) the claims or defenses of the representative parties are *typical* of the claims or defenses of the class; and (4) the *representative parties* will fairly and adequately protect the interests of the class." *Johnson*, 780 F.3d at 137 (emphasis added).

## A. *Rule 23(a)(1): Numerosity*

Rule 23(a)(1) provides: "One or more members of a class may sue or be sued as representative parties on behalf of all members only if . . . the class is so numerous that joinder of all members is impracticable[.]" Fed. R. Civ. P. 23(a)(1).

"[N]umerosity is presumed at a level of 40 members[.]" *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995) (citing 1 Herbert B. Newberg & Alba Conte, Newberg on Class Actions § 3.05 (2d ed. 1985)); *see e.g., Rodriguez v. It's Just Lunch, Int'l*, 300 F.R.D. 125, 132 (S.D.N.Y. 2014) (finding plaintiff "greatly exceeded [the requirement], since more than ten thousand individuals purchased defendants' services annually during each year of the proposed class period"). Plaintiff must present either evidence of the number or a "reasonable estimate." *Kalkstein v. Collecto, Inc.*, 304 F.R.D. 114, 119 (E.D.N.Y. 2015) (citations omitted).

Here, numerosity is obvious. Class Cert. Hr'g Tr. 16:21–24 (court noting that numerosity is not a hurdle in the instant case). The number of individual purchases of Freshmates in New York is over a million. *See* Decl. of Lester L. Levy in Supp. of Pl.'s Mot. for Class Cert., Feb. 27, 2014, ECF No. 62, at ¶ 2 (outlining number of purchasers); Class Cert. Hr'g Tr. 11:9–12:5 (plaintiff estimating approximately 1.9 million units sold during the class period), 45:24–25 (defendant challenging data but conceding "it can approximate…1.9 million").

## B. *Rule 23(a)(2): Commonality*

Rule 23(a)(2) requires that plaintiff establish that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2).

Not "*all* questions of law or fact raised" need be "common." *Dukes*, 131 S. Ct at 2562 (emphasis added) (citing 1 Herbert B. Newberg & Alba Conte, Newberg on Class Actions § 3.10 (3d ed. 1992)). "[E]ven a single common question will do." *Id.* at 2556 (quoting Richard A. Nagareda, *The Preexistence Principle and the Structure of the Class Action*, 103 Colum. L. Rev. 149, 176 n.110 (2003)); *see, e.g.*, *Dukes*, 131 S. Ct. at 2551 ("commonality requirement may be satisfied if plaintiffs demonstrate that the class members 'have suffered the same injury'")

(citation omitted); *In re Agent Orange Prod. Liab. Litig. MDL No. 381*, 818 F.2d 145, 167 (2d Cir. 1987) (commonality requirement satisfied where class members shared common defense); Mem. & Order, Mar. 20, 2014, at 11 ("One common motivation and one common injury, payment of a premium price, are sufficient.").

Plaintiff must demonstrate that his claims "depend upon a common contention . . . of such a nature that [it] is capable of classwide resolution—which means that the determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 131 S. Ct. at 2551. The common contention must generate "common answers apt to drive the resolution of the litigation." *Id.* (citing Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 132 (2009)). Commonality is "the glue holding class members' claims together." *Enriquez v. Cherry Hill Mkt. Corp.*, 993 F. Supp. 2d 229, 236 (E.D.N.Y. 2013) *reconsideration denied* (June 25, 2014) (citation omitted).

*In re Scotts EZ Seed Litig.*, 304 F.R.D. 397 (S.D.N.Y. 2015), a consumer class action brought under New York General Business Law § 349, is instructive. Plaintiffs presented the following contention: defendant's claim that their grass is "50% thicker" than that produced by "ordinary seed" is "false and/or misleading." *Id.* at 405. Because the "*answer* to this question [wa]s common to all class members, and [wa]s apt to drive the resolution of th[e] litigation," plaintiffs fulfilled the commonality requirement. *Id.* (emphasis added; collecting cases).

Courts have found that, despite differing "individual circumstances of class members," commonality exists where "'injuries derive from a unity course of conduct by a single system.'" *Ebin*, 297 F.R.D. at 565 (citing *Marisol A.*, 126 F.3d at 377). For example, in *Ebin v. Kangadis Food Inc.*, plaintiffs brought a putative consumer class action alleging violations of numerous state laws, including New York General Business Law § 349, for the mislabeling of pomace as

53

"100% Pure Olive Oil." *Id*. at 564.  Defendants attempted to defeat commonality by arguing that different states had varying standards to distinguish between pomace and olive oil and, therefore, the plaintiffs from different states lacked commonality.  *Id.* at 565.  But the court rejected the argument, relying on defendant's single system of fraudulent advertising as the common thread. *Id.* at 566.

In the instant case, commonality is satisfied.  The proposed class presents common questions:

(1) What does defendant's "flushable" representation mean to a reasonable consumer?

(2) Do Freshmates satisfy that meaning?

(3) Is defendant's "flushable" representation materially misleading?

(4) Did class members pay an unsupported premium as a result of the "flushable" representation?

(5) Was that premium—to the extent that it can be reasonably ascertained—relatively uniform?

Defendant demurs, arguing that the alleged injury—payment of a price premium— "depends on the purchaser's individual experience with the product *after* purchase."  Def.'s Reply in Supp. of Mot. to Deny Class Cert., Apr. 30, 2015, ECF No. 88 ("Def.'s Reply"), at 6 (emphasis added).

But "that is not the right way to think about 'injury' in the false-advertising context." *Rikos*, 2015 WL 4978712, at *5 (collecting cases).  Liability under New York General Business Law § 349 does not depend on whether class members relied upon the representation when they purchased Freshmates, nor does it depend on whether the product met their personal, subjective expectations.  *See, e.g.*, *Pelman ex rel. Pelman v. McDonald's Corp.*, 396 F.3d 508, 511 (2d Cir.

54

2005) ("a private action brought under § 349 does not require proof of actual reliance"). Rather, the "injury is the purchase price." *Ebin v. Kangadis Food Inc.*, No. 13-CV-2311, 2013 WL 6504547, at *5 (S.D.N.Y. Dec. 11, 2013); *see also Orlander v. Staples, Inc.*, No. 14-CV-2677, 2015 WL 5438783, at *9 (2d Cir. Sept. 16, 2015) (collecting cases where "the issue of the 'price premium' was relevant because it showed that plaintiffs paid more than they would have for the good but for the deceptive practices of the defendant-sellers"). The fact that some "consumers were satisfied with the product is irrelevant." *Rikos*, 2015 WL 4978712, at *5. "It is not necessary for all of the plaintiffs to have had a 'uniform' experience with respect to the product." *Ackerman*, 2013 WL 7044866, at *10. The purpose of New York General Business Law § 349, is to "punish companies that sell products using advertising that misleads the reasonable consumer." *Rikos*, 2015 WL 4978712, at *5 (addressing non-New York State false advertising laws); *see also Ackerman*, 2013 WL 7044866, at *10 (recommending certification of class based on common question: "whether or not the product name [Vitaminwater] was misleading or deceptive to a reasonable consumer"); *Dei Rossi v. Whirlpool Corp.*, No. 12-CV-00125, 2015 WL 1932484, at *4 (E.D. Cal. Apr. 28, 2015) (finding commonality—in putative class action brought under California consumer protection statutes and common law— based on the existence of the following questions: "(1) whether Defendant labeled and advertised the Refrigerators as Energy Star qualified; (2) whether the Refrigerators met the standards of energy efficiency established by the Energy Star program; (3) whether the Energy Star mark and advertising were material to class members' decision to purchase the Refrigerators; and (4) whether class members were damaged by purchasing Refrigerators that were not Energy Star qualified"). Those who are satisfied that the premium was worthwhile can opt out or decline to file for damages awarded to the class.

The instant case is distinct from cases like *In re Canon Cameras*, 237 F.R.D. 357 (S.D.N.Y. 2006), relied upon by defendant, which addressed the existence of a product defect, about which defendant allegedly failed to inform plaintiffs. *See id.* at 359; Def.'s Reply 10. There, the court denied certification based, in part, on lack of commonality because plaintiff could not prove the number of cameras that actually malfunctioned. Here, by contrast, the injury is the price premium on every product sold, not the purchase of some defective products sold among many without defect.

### C. *Rule 23(a)(3): Typicality*

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are *typical* of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3) (emphasis added).

Although the analysis of typicality and commonality "tend to merge," each is "distinct." *Morangelli v. Chemed Corp.*, 275 F.R.D. 99, 104 (E.D.N.Y. 2011), and "serve[s a] different function[]." 5 James Wm. Moore et al., Moore's Federal Practice § 23.23[6] (3d ed. 2015). The commonality requirement "tests the definition of the class itself," while "the typicality requirement focuses on *how* the named plaintiff's claims compare to the claims of the other class members," *id.* (emphasis added). Typicality, therefore, acts as a "guidepost[] for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff[s'] claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Rodriguez*, 300 F.R.D. at 136 (citing *Dukes*, 131 S. Ct. at 2551 n. 5); *accord Morangelli*, 275 F.R.D. at 104. Typicality ensures that "class representatives have the incentive to prove all the elements of the cause of action which would be presented by the individual members of the class were they

initiating individualized actions." *In re Veeco Instruments, Inc. Sec. Litig.*, 235 F.R.D. 220, 238 (S.D.N.Y. 2006) (citation omitted).

Typicality "is not highly demanding." *Dial Corp.*, 2015 WL 4104624, at *4 (citation omitted). "[C]omplete symmetry between the class representative's claims and those of the absent class members" is not required, *In re Vitamin C Antitrust Litig.*, 279 F.R.D. 90, 105 (E.D.N.Y. 2012) (citation omitted), "so long as the named plaintiff's claims share the same essential characteristics as that of the proposed class." *Marcus*, 307 F.R.D. at 99–100. Courts interpret this to mean that "'each class member's claim arises from the *same course of events* and each class member makes *similar legal arguments* to prove the defendant's liability.'" *Ebin*, 297 F.R.D. at 565 (citing *Robidoux v. Celani*, 987 F.2d 931, 936 (2d Cir. 1993)). Alternatively stated, "disputed issues of law or fact" must "occupy essentially the *same degree of centrality* to the named plaintiff's claim as to that of other members of the proposed class." *In re Scotts*, 304 F.R.D. at 405–06 (emphasis added) (citing *Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*, 301 F.R.D. 116, 132 (S.D.N.Y. 2014)). "[M]inor variations in the fact patterns underlying individual claims" are common. *Dial Corp.*, 2015 WL 4104624, at *4 (citations omitted); *see, e.g., In re Indep. Energy Holdings*, 210 F.R.D. 476, 484 (S.D.N.Y. 2002) ("While the extent of any non-reliance on [plaintiffs'] part will certainly be a fact question to be decided at trial, it is unlikely to significantly shift the focus of the litigation to the detriment of the absent class members.").

"[T]he existence of defenses unique to the named plaintiff may preclude class certification only if the unique defenses 'threaten to become the focus of the litigation.'" *Butto v. Collecto Inc.*, 290 F.R.D. 372, 384 (E.D.N.Y. 2013) (citing *Gary Plastic Packaging v. Merrill Lynch*, 903 F.2d 176, 180 (2d Cir. 1990)) (finding that the unique defense—that plaintiff failed

to follow the necessary statutory steps for recourse under the Fair Debt Collection Practices Act—did not overshadow the common issue: substantially similar collection letters sent by defendant which dominated the class action proceeding); *see also Lapin v. Goldman Sachs & Co.*, 254 F.R.D. 168, 180 (S.D.N.Y. 2008) ("[E]ven if [defendant] had shown the presence of a meritorious unique defense as to [p]laintiff, the [c]ourt finds that the litigation of this potential defense will not threaten to become the focus of the litigation . . . because it does not go to the heart of [p]laintiff's case and will not require considerable time and effort to rebut." (citations omitted)).

"[D]ifferences in damages arising from a disparity in injuries among the class members" does not necessarily preclude class certification. *Espinoza v. 953 Assoc. LLC*, 280 F.R.D. 113, 128 (S.D.N.Y. 2011) (certifying class where injuries derived from same course of conduct despite differing damages arising from disparate injuries of class members); *see also Spencer v. No Parking Today, Inc.*, No. 12-CV-6323, 2013 WL 1040052, at *19 (S.D.N.Y. Mar. 15 2013) (finding—with respect to the potential calculation of damages—"no merit to [the defense's] argument . . . that typicality is not established because [the named plaintiff] may have worked more overtime hours than the other class members"); *cf. Bentley v. Verizon Bus. Global, LLC*, No. 07-CV-9590, 2010 WL 1223575, at *5 (S.D.N.Y. Mar. 31 2010) (denying class certification because plaintiff's damages were atypical where plaintiff did not pay the disputed charges underlying the litigation).

In the instant case, typicality is satisfied. The named plaintiff purchased defendant's "flushable" wipes at a price higher than that of non-flushable wipes. *See supra* Parts I, V. He explicitly declared that he bought the wipes "[b]ecause they were flushable[,]" and proceeded to use them as directed. *See supra* Part II. Plaintiff's "and other class members' claims arise out of

58

the same course of conduct by the defendant and are based on the same legal theories." *Ebin*, 297 F.R.D. at 565.

Defendant argues that plaintiff falls short because he has yet to pay for any damages related to his plumbing. *See* Def.'s Opp'n at 21. But the fact that the plaintiff has not paid his plumbing bill neither threatens to become the focus of the present litigation, nor to disrupt the central concern in this case—the payment of a premium price. *See supra* Parts I, V. In any event, the damages related to plumbing are peculiar to plaintiff and do not affect the case for a premium price recovery by purchasers or statutory damages.

The defendant also contends that the named plaintiff is atypical because (1) the toilets in his home connect to a sewer system, not a septic tank; (2) his plumbing is poorly maintained, and (3) that he experienced clogs prior to his use of Freshmates. Def.'s Reply 3–4. These issues are not part of the class action. They will be separately determined. Defendant again misconstrues the central contention in the case: plaintiff paid a premium for a product that misrepresented itself as flushable. The injury is the payment of an inflated price, not the clog. What happened after his purchase, as a result of his sewage disposal system or the condition of his pipes, is irrelevant to the class's premium price theory.

### D. *Rule 23(a)(4): Adequacy of Representation*

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).

This requirement is rooted in due process concerns. *See In re LILCO Sec. Litig.*, 111 F.R.D. 663, 672 (E.D.N.Y. 1986) (citation omitted) ("The Court's obligation to examine a proposed class representative's adequacy is even more significant in light of the constitutional defect that attaches to the choice of an inadequate class representative."). "As a threshold matter,

a class representative is not" deemed "'adequate' unless it is a member of the class it purports to represent." *In re Vitamin C Antitrust Litig*., 279 F.R.D. at 100.

Once the threshold showing is made, a three-part test must be met. First, plaintiff must "demonstrate that class counsel is qualified, experienced . . . generally able to conduct the litigation," *id.* (citation omitted), and that no conflicts exist that "might impair its representation." *Seijas v. Rep. of Argentina*, 606 F.3d 53, 57 (2d Cir. 2010) (citation omitted). Second, "the named plaintiff must show that there is no conflict of interest between the named plaintiffs and other members of the plaintiff class." *Id.* (citations omitted). Finally, "a named plaintiff must exhibit enough integrity and credibility to convince the court that the named plaintiff will diligently perform its fiduciary duties to the class." *Id.* (citations omitted); *see, e.g.*, *In re Literary Works in Elec. Databases Copyright Litig*., 654 F.3d 242, 250–55 (2d Cir. 2011) (finding plaintiffs, who held Category A, B and C claims, to be inadequate representatives for class members who held only Category C claims because plaintiffs would likely pursue the more lucrative Category A and B claims).

Here, defendant challenges the threshold showing, arguing that plaintiff is not adequate member of the class because his claims are not typical. But the court has rejected this argument. *See supra* Part IX.C. Defendant next contends that plaintiff is not an adequate representative because he does not remember the price he paid for Freshmates. Class Cert. Hr'g Tr. 50:15–18; Def.'s Opp'n. 6 n.3. But plaintiff testified he paid between four and five dollars. Pl.'s Mar. 27 Dep. 31:16–17. This estimate is sufficient at this point of the litigation. A requirement that consumers retain receipts for or remember the exact amount paid for sundries in order to bring a cause of action would undermine the ability of consumers to bring small item actions. *See infra* Part IX.E. Detailed studies will probably be able to support well-founded, average costs. *See*

*supra* Part VI.A.  The prices of wipes is likely to be close to uniform, as a result of competition

among retailers of toiletry items that tends to keep wholesale and retail prices of toiletry items in

line.

There is some doubt about whether the first prong of the adequacy test is satisfied.  It is

not clear that counsel (or plaintiff) is planning, or able, to finance the expensive consumer and

economic studies necessary for effective prosecution of a case on a premium price theory.  But,

since plaintiff is now seeking only the statutory fifty dollar premium, the issue of lack of

consumer expectation studies is not likely to be decisive.  In other respects, counsel appears

qualified to represent the class; the court is aware of no conflicts of interest.  For his part,

plaintiff has "demonstrated [his] commitment to pursue these claims on behalf of class members

by . . . sitting for lengthy depositions." *Ebin*, 297 F.R.D. at 566 (finding adequacy where

plaintiffs sat for "lengthy depositions," responded to written discovery requests, and testified that

he was "committed" to the case); Pl.'s Mar. 27 Dep. 104:8.  He has appeared in court, *id.* at

104:8–9, and he understands he will "probably have to go to court" again.  *Id.* at 102:14–15.  He

read the complaint before it was filed.  *Id.* at 21:6.  Adequacy appears to be satisfied.

### E.  *Implied Requirement of Ascertainability*

The Court of Appeals for the "Second Circuit has recognized a fifth pre-condition to class

certification: the implied requirement of ascertainability." *In re Scotts*, 304 F.R.D. at 407

(S.D.N.Y. 2015) (citation omitted); *see Brecher v. Rep. of Argentina*, No. 14-4385, 2015 WL

5438797, at *2 (2d Cir. Sept. 16, 2015).  For a class to be ascertainable, the class definition must,

first, be based on "objective criteria" and, second, it must be "administratively feasible" to

identify class members without conducting a "mini-hearing on the merits of each case."

*Charron v. Pinnacle Group N.Y. L.L.C.*, 269 F.R.D. 221, 229 (S.D.N.Y. 2010) (citation omitted)

(injunctive class ascertainable where defined as tenants in an apartment that was rent-regulated and owned directly or indirectly by the defendant landlord as of the date of the court's opinion); *see also Brecher*, 2015 WL 5438797, at *2 (damages class defined only as beneficial owners of a bond series insufficiently definite to identify the class of persons who would be bound). This standard "is not demanding and is designed only to prevent the certification of a class whose membership is truly indeterminable." *Ebin*, 297 F.R.D. at 567. In fact, "[c]lass members need not be ascertained prior to certification, but the exact membership of the class must be ascertainable at some point in the case." *In re Methyl Tertiary Butyl Ether ("MTBE") Prod. Liability Litig*., 209 F.R.D. 323, 337 (S.D.N.Y. 2002) (citation omitted) (class ascertainable where the proposed class definition was owners of wells containing MTBE located in a class state).

Here, defendant maintains that the class is not ascertainable because consumers did not retain receipts. Def.'s Opp'n 21–22. "District judges in this District," and elsewhere, "have expressed conflicting views on whether putative classes are ascertainable when consumers are unlikely to retain receipts or other records of purchase" or whether additional records are required. *In re Scotts*, 304 F.R.D. at 407 (comparing cases); *see also Mosely v. Vitalize Labs, LLC*, No. 13-CV-2470, 2015 WL 5022635, at *5 (E.D.N.Y. Aug. 24, 2015) (denying summary judgment in consumer class action where "a reasonable juror could conclude that [plaintiff] purchased [the product in question] . . . despite his lack of physical proof of purchase" and collecting contrary cases that required proof of purchase); *Carrera v. Bayer Corp.*, 727 F.3d 300, 305–12 (3d Cir. 2013) (adopting heightened ascertainability requirement and holding that affidavits by prospective class members do not satisfy the ascertainability requirement); *Mullins*, 2015 WL 4546159, at *7–8 (comparing cases); *Guido*, 2014 WL 6603730, at *17 (C.D. Cal. July

24, 2014) (comparing cases). The Second Circuit Court of Appeals has yet to weigh in on whether "heighted" ascertainability is required. *See* Jeremy M. Creelan & Kate T. Spelman, *Ascertaining the Requirements for Ascertainability Under Rule 23*, New York Law Journal, Oct. 1, 2015, at 4.

The decision to allow "self-identification" in place of proof of purchase has sometimes turned on whether the alleged misrepresentation was uniform across all products. *See Ebin*, 297 F.R.D. at 567 (finding class of olive oil consumers ascertainable through self-identification where allegedly false labeling was uniform across the product); *Ault*, 2015 WL 4692454, at *5 (collecting and comparing cases from both in and outside the Second Circuit where courts based decision to allow self-identification on uniformity of representations but finding class that did not keep records not ascertainable); *but see Weiner v. Snapple Beverage Corp*., No. 07-CV-8742, 2010 WL 3119452, at *13 (S.D.N.Y. Aug. 5, 2010) (finding class of purchasers of beverage not ascertainable where plaintiffs "offer[ed] no basis to find that putative class members will have retained a receipt, bottle label, or any other concrete documentation of their purchases of the product," especially as distinct from other Snapple products).

In the instant case, the proposed class is ascertainable. It is "all persons or entities who purchased Freshmates in New York State between May 23, 2011 and May 23, 2014." Pl.'s Mem. 1. The definition "identifies a particular group of individuals [who were] harmed in a particular way (defrauded by labels and marketing materials [leading to higher prices]) during a specific period in particular areas." *Mullins v. Direct Digital, LLC*, 795 F.3d at 661 (7th Cir. 2015) (collecting cases). Only one product is at issue, and it was labeled in a uniform manner. *See, e.g., In re Scotts*, 304 F.R.D. at 407 (classes consisting of New York and California

purchasers of EZ Seed packages containing the uniform 50% thicker claim . . . "sufficiently specific to satisfy the ascertainability requirement" despite likely lack of receipts).

Because it is unlikely that consumers will retain receipts for low cost items such as wipes, plaintiff may rely on affidavits for those without receipt. Plaintiff may also identify some consumers via internet purchase records. Class Cert. Hr'g Tr. at 10:5–11:6. To require receipts "would render class actions against producers almost impossible to bring." *Ebin*, 297 F.R.D. at 567. As one scholar noted:

> [R]igorous insistence on proof-of-purchase is counterproductive. If one's goal is to ensure that compensation flows to injured parties, the most important step we can take is to relax the filter that prevents uninjured parties from obtaining compensation. *Proof-of-purchase requirements may do a good job of keeping damages from the uninjured, but courts' extravagant concern with compensating the uninjured does an equally effective job of keeping damages from the truly injured*.

Myriam Gilles, *Class Dismissed: Contemporary Judicial Hostility to Small-Claims Consumer Class Actions*, 59 DePaul L. Rev. 305, 316 (2010) (emphasis added).

### F.  *Federal Rule of Civil Procedure 23(b) Factors*

After satisfying the requirements of Rule 23(a), "plaintiff must show that the claims are among [one of] three types of class actions defined in Rule 23(b)." *Calabrese v. CSC Holdings, Inc.*, No. 02-CV-5171, 2009 WL 425879, at *5 (E.D.N.Y. Feb. 19, 2009). Here, plaintiff seeks class certification under both 23(b)(2) (injunctive relief) and (b)(3) (money damages). Mem. in Supp. of Pl.'s Mot. for Class Cert., Feb. 27, 2015, ECF No. 58-1, at 2.

#### 1.  Rule 23(b)(2) Injunctive Relief

##### a.  Article III Standing

In its motion to deny class certification, defendant challenges named plaintiff's Article III standing to pursue injunctive relief for a product he will not re-purchase. Def.'s Mem. in Supp.

of its Mot. to Dismiss Pl.'s Compl. for Fail. to State a Claim, Strike Mot.'s Class Action Alleg.,

and Dismiss Pl.'s Claim for Inj. Relief for Lack of Standing, Oct. 3, 2014, ECF No. 17, at 10–12.

For the reasons stated in the court's memorandum and order on the motion to dismiss, the

court finds that plaintiff has Article III standing.  This is the law of the case..  As the court wrote:

> To hold [that plaintiff lacks Article III standing] would denigrate
> the New York consumer protection statute, designed as a major
> support of consumers who claim to have been cheated.  The only
> way a consumer could enjoin deceptive conduct would be if he
> were made aware of the situation by suffering injury. But once the
> consumer learned of the deception, he would voluntarily abstain
> from buying and therefore could no longer seek an injunction.

Mem. & Order, Mar. 20, 2015, at 7; *cf. Ries v. Arizona Beverages USA LLC*, 287 F.R.D. 523,

533 (N.D. Cal. 2012) ("[W]ere the Court to accept the suggestion that plaintiffs' mere

recognition of the alleged deception operates to defeat standing for an injunction, then injunctive

relief would never be available in false advertising cases, a wholly unrealistic result.").

Public policy, as well as precedent, supports this holding.  *See* Mem. & Order, Mar. 20,

2015, at 6 (collecting cases and denying motion to dismiss, pursuant to Fed. R. Civ. P. 12(b)(1),

for lack of subject matter jurisdiction); *Dei Rossi v. Whirlpool Corp*., No. 2:12-CV-00125, 2015

WL 1932484, at *3 (E.D. Cal. Apr. 28, 2015) (finding that consumers who purchase product at a

premium based on advertised specifications suffer an economic injury when that product fails to

meet the advertised specifications, and therefore possess Article III standing); *but see Elkind v.*

*Revlon Consumer Prod. Corp.*, No. 14-CV-2484, 2015 WL 2344134, at *3 (E.D.N.Y. May 14,

2015) (collecting cases and granting motion to dismiss claims for injunctive relief because

plaintiff-consumer, unlikely to repurchase product, cannot allege future harm); *Machlan v.*

*Procter & Gamble Co*., 77 F. Supp. 3d 954, 960 (N.D. Cal. 2015) (granting motion to dismiss

claims for injunctive relief because plaintiff lacks Article III standing to pursue claims based on flushable wipes he will not purchase again).

b. Likely 23(b)(2) Class Certification

"Rule 23(b)(2) class is appropriate only when a *single* injunction or declaratory judgment would provide relief to *each member of the class*." *Ault v. J.M. Smucker Co.*, No. 13-CV-3409, 2015 WL 4692454, at *8 (S.D.N.Y. Aug. 6, 2015) (emphasis added) (quoting *Dukes*, 131 S. Ct. at 2557). "It does not authorize class certification when each individual class member would be entitled to a *different* injunction or declaratory judgment against the defendant." *Dukes*, 131 S. Ct. at 2557. "Individualized monetary claims are inappropriate in a class certified under Rule 23(b)(2); therefore, claims for monetary relief may not be certified under Rule 23(b)(2), at least where . . . the monetary relief is not *incidental* to the injunctive or declaratory relief." *Ault*, 2015 WL 4692454, at *8 (emphasis added) (quoting *Dukes*, 131 S. Ct. at 2557); *see also Nationwide Life Ins. Co. v. Haddock*, 460 F. App'x 26, 29 (2d Cir. 2012) (summary order) ("unless merely 'incidental' to the requested declaratory or injunctive relief, claims for individualized monetary damages preclude class certification under Rule 23(b)(2)"). "[M]onetary relief is considered incidental when it 'flows directly from liability to the class as a whole on the claims forming the basis of the injunctive or declaratory relief' and does not entail complex individualized determinations." *Ackerman*, 2013 WL 7044866, at *16 (quoting *Dukes*, 131 S. Ct. at 2560) (recommending certification of 23(b)(2) class based on premium price injury but recommending denial of 23(b)(3) price premium class).

Some courts impose "two additional hurdles that plaintiffs must clear in order to certify a (b)(2) class." *Laumann v. Nat'l Hockey League*, No. 12-CV-1817, 2015 WL 2330107, at *7 (S.D.N.Y. May 14, 2015).

> *First,* plaintiffs must demonstrate that the class is "*cohesive.*" This requirement is similar, conceptually, to the commonality requirement under Rule 23(a). *Second,* plaintiffs must demonstrate that class certification is, in the first instance, *necessary.* Because the relief available under Rule 23(b)(2) is injunctive and declaratory—rather than monetary—certification is not always required to secure the rights in question.

*Id.* (emphasis added).

Here, certification of an injunctive class is appropriate. Rule 23(b)(2)'s rigorous requirements are satisfied. First, an injunction prohibiting defendant from labeling Freshmates "flushable" and "safe for sewer and septic systems" would provide a single solution, applicable to each class member. Second, the proposed class is cohesive, as demonstrated *infra*, Part IX.2.a, where the court finds predominance. Third, certification of an injunctive class is necessary because an injunction, unlike monetary damages, will protect the rights of all consumers.

Plumbing costs are nominal and need not thwart certification. The monetary relief sought by some class members—in the form of individual plumbing costs—is incidental to the injunctive relief, and can be separately tried.

The court would give favorable consideration to certifying a 23(b)(2) injunctive class. But for the reasons explained below, the court stays its decision on the question. *See infra* Parts X, XI.

### 2. Rule 23(b)(3) Damages

In addition to meeting the threshold requirements of Rule 23(a), "a plaintiff [seeking damages pursuant to Fed. R. Civ. P. 23(b)(3)] must establish (1) *predominance*—that the questions of law or fact common to class members predominate over any questions affecting only individual members; and (2) *superiority*—that a class action is superior to other available

methods for fairly and efficiently adjudicating the controversy." *Johnson*, 780 F.3d at 137

(emphasis added) (citing Fed. R. Civ. P. 23(b)(3); additional citation omitted).

 a. 23(b)(3): Predominance

 "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently

cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623. "Economies of

time, effort, and expense in fully resolving each plaintiff's claim will only be served, and the

predominance requirement satisfied, if the plaintiffs can show that *some* of the . . . questions can

be answered with respect to the members of the class as a whole through generalized proof and

that those common issues are more substantial than individual ones." *Myers*, 624 F.3d at 549

(emphasis added; citation omitted). Although "predominance" is a "far more demanding inquiry

into the common issues which serve as the basis for class certification" than commonality, it

"does *not* require a plaintiff seeking class certification to prove that each element of her claim is

susceptible to classwide proof." *Sykes v. Mel S. Harris & Assoc. LLC*, 780 F.3d 70, 81 (2d Cir.

2015) (citations omitted).

 Defendant challenges predominance on four main grounds. First, defendant claims that

plaintiff cannot prove the elements of a § 349 claim on a *classwide* basis because determination

of whether consumers were injured by the "flushable" label requires an *individualized* inquiry

into each purchaser's experience. Some consumers, defendant contends, have "consistently

flushed without a problem" and therefore could not "have been deceived" by the "flushable"

label. Def.'s Mem. of Law in Supp. of its Mot. to Deny Class Cert., Feb. 27, 2015, ECF No. 60,

at 29. In so arguing, defendant analogizes the instant case to *Vaccariello v. XM Satellite Radio,*

*Inc.*, 295 F.R.D. 62 (S.D.N.Y. 2013). There, the court found that individual issues predominated

in a putative class of purchasers of satellite radio service who alleged deception in the automatic

renewal of their subscription. *Id.* at 68. Divining which consumers suffered no injury (because they actually wanted their services renewed) meant that individualized inquiries would trump common ones. *Id.*

*Vaccariello* is inapposite. Unlike that case, where some consumers received the service they wanted, in the instant case either all consumers purchased "flushable" wipes that were, in fact, "flushable," or none did. In this way, the case is more akin to *Ebin*, 297 F.R.D.at 569, where plaintiff sought to certify a damages class of purchasers of a product labeled "100% olive oil," which was actually pomace. Individualized inquiries were unnecessary. The product was not what it said it was. All class members, even those who "actively wanted to buy pomace instead of 100% pure olive oil" suffered an injury: they "paid too much for it." *Id*.; *see also In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig*., 722 F.3d 838, 857 (6th Cir. 2013) ("Because *all* Duet owners were injured at the point of sale upon paying a premium price for the Duets as designed, even those owners who have not experienced a mold problem are properly included within the certified class."), *cert. denied sub nom. Whirlpool Corp. v. Glazer*, 134 S. Ct. 1277 (2014); *In re Avon Anti-Aging Skincare Creams & Products Mktg. & Sales Practices Litig*., No. 13-CV-150, 2015 WL 5730022, at *4 (S.D.N.Y. Sept. 30, 2015) (comparing cases where misrepresentation was uniform, leading to a finding of predominance, with those where it varied).

Here, first, if Freshmates are found to be not "flushable," then all consumers were injured. This question predominates. The question of whether Freshmates do not disintegrate "for some individuals goes solely to the merits; it has no relevance to the class certification issue." *Rikos*, 2015 WL 4978712, at *17 (finding that where probiotic supplement worked for some individuals goes to merits of plaintiff's claim and not to commonality); *cf. Anonymous v.*

*CVS Corp.*, 728 N.Y.S.2d 333, 340 (N.Y. Sup. Ct. 2001) (finding dismissal of the N.Y.G. B.L. § 349 putative class unwarranted even where some customers appeared not to suffer injury and continued to conduct business with defendant).

Second, defendant contends that determining whether the "flushable" label was "*material to [an] individual consumer's decision to purchase [Freshmates] will require individualized proof.*" Def.'s Mem. 29 (emphasis added). Defendant improperly analogizes to *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215 (2d Cir. 2008), a fraud-based RICO case involving allegations of misrepresentation of "light" cigarettes as healthier alternatives to "full-flavor" cigarettes. There, the Court of Appeals for the Second Circuit found that common issues did not predominate because proving reliance, an element of RICO, would require individualized inquiries. *McLaughlin*, 522 F.3d at 223. But *McLaughlin* is not controlling here. Unlike RICO claims, "individualized proof of reliance is not necessary" for § 349 claims. *Guido*, 2013 WL 3353857, at *12; *see also Ackerman*, 2013 WL 7044866, at *2 (collecting cases holding that N.Y.G.B.L. § 349 does not require reliance); *but cf. Haynes v. Planet Automall, Inc.*, 276 F.R.D. 65, 80 (E.D.N.Y. 2011) (*dicta* positing that § 349 claims require individualized proof of reliance).

The question of whether the "flushable" label was *material* to consumer's decision to purchase "is an objective inquiry that focuses on that packaging." *Guido*, 2013 WL 3353857, at *12 (holding that N.Y.G.B.L. requires applying objectively reasonable average consumer standard based on common proof); *see also In re Scotts*, 304 F.R.D. at 409 (holding that "the materiality of an alleged misrepresentation [under New York General Business Law] is judged according to an objective standard" (citation omitted)). This classwide inquiry issue predominates over individual issues.

70

To adopt *McLaughlin* here would conflate "reliance" and "causation," which the New York Court of Appeals has "cautioned against." *Rodriguez*, 300 F.R.D. at 147 (citation omitted) (causation under § 349 requires "nothing more . . .than . . . plaintiff suffer a loss because of defendants' deceptive act").

Third, the defendant challenges plaintiff's expert Weir's premium damages model as insufficient to establish classwide injury. Def.'s Opp'n 4. But Mr. Weir's report is adequate for class certification. *See, e.g., In re Scotts*, 304 F.R.D. at 413 (model sufficient at the class certification stage where Mr. Weir identified the "statistical methodology" he would use and described that "methodology in detail"); *cf. Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, No. 12-CV-5329, 2015 WL 5000849, at *21 (S.D.N.Y. Aug. 20, 2015) (only "minimal scrutiny" of the damages model is required for class certification (citing *Comcast Corp.*, 133 S. Ct. 1426)).

Hedonic regression can be used to determine whether the class paid a premium for the product because it was marketed as "flushable." Mr. Weir's ability to isolate a premium for a claimed useful characteristic of a product has been approved and found sufficient to certify a consumer class claiming deception in violation of § 349. *See In re Scotts*, 304 F.R.D. at 413 (certifying a § 349 damages class based upon a premium price damages model, developed by Mr. Weir, that would isolate the price premium associated with the alleged misrepresentation of "50% thicker" on the product's label); *cf. Brown v. Hain Celestial Grp., Inc.*, No. 11-03082, 2014 WL 6483216, at *19 (N.D. Cal. Nov. 18, 2014) (accepting proposed price premium damages model that controlled for other variables, was proposed by a reputable expert, and relied upon products within one universe); *Werdebaugh v. Blue Diamond Growers*, No. 12-CV-2724, 2014 WL 2191901, at *23 (N.D. Cal. May 23, 2014) (rejecting price premium damages model

71

where, among other things, the expert simply assumed that 100% of the price difference was attributable to the alleged misrepresentation and did not control for other product attributes); *Oscar*, 274 F.R.D. at 511–13 (emphasis added) (denying certification of § 349 class action premised on price premium injury where plaintiff, had "adduced absolutely *no* evidence that he could demonstrate on a class-wide bases that consumers would have paid less for their [cars] if they had known that the tires were susceptible to puncture").

Once the injury is established, statutory damages can be calculated on a classwide basis. New York General Business Law § 349(h) provides for statutory damages of $50 to each class member for each time defendant violated the statute. *Cf. Guido*, 2014 WL 6603730, at *18 (affirming that class members are entitled to $50 statutory damages under § 349(h) even though the amount "grossly outweigh[s]" the actual purchase price). Although not necessary, expert Weir may be able to determine an average price paid for the misrepresentation.

This case is not barred by *Zyprexa UFCW Local 1776 v. Eli Lilly & Co.*, 620 F.3d 121, 133 (2d Cir. 2010). There, the Second Circuit Court of Appeals held that certification of a putative class based on an "excess price theory" constituted an "abuse of discretion" because the damages model was "not susceptible to generalized proof with respect to either but-for or proximate causation." *Id.* But *Zyprexa* is distinguishable on two grounds. First, in that case the issue was whether plaintiffs demonstrated *reliance*, an element not required under New York General Business Law § 349. *See supra* Part VII. Second, in *Zyprexa* (as distinct from the instant case) the persons who purportedly relied on the misrepresentations were distinct from those who were allegedly harmed. *Zyprexa*, 620 F.3d at 133.

Finally, defendant argues that, for those class members who experienced plumbing problems, individualized issues as to causes of those problems will predominate. Def.'s Mem.

32.  Individualized issues will be tried on an individual basis, not as part of the class action.

They have no effect on class certification.

### b. 23(b)(3): Superiority

Rule (b)(3) permits class certification only where a class action is "superior to other

available methods" of adjudication.  Fed. R. Civ. P. 23(b)(3); *Ramirez v. Dollar Phone Corp.*,

668 F. Supp. 2d 448, 468 (E.D.N.Y. 2009).  To qualify, a class action must be arguably the most

"fair [] and efficient[]" method of resolving the dispute.  Fed. R. Civ. P. 23(b)(3).  "The class

action device is particularly well-suited in situations where 'plaintiffs are allegedly aggrieved by

a single policy of defendant[] . . . since many nearly identical litigations can be adjudicated in

unison.'" *Poplawski v. Metroplex on the Atl., LLC*, No. 11-CV-3765, 2012 WL 1107711, at *11

(E.D.N.Y. Apr. 2, 2012) (citing *In re Nassau County Strip Search Cases*, 461 F.3d 219, 228 (2d

Cir. 2006)).  Courts will consider four non-exclusive factors:

> (A) the class members' interests in individually controlling the
> prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the
> controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation
> of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3)(A)–(D).

"[T]he court has discretion to consider other relevant factors . . .[which may include] (1)

consideration of the alternative methods of adjudication available for the claims, (2) a

comparison of the fairness to all whose interests are implicated between any alternative methods

and a class action, and (3) a comparison of the efficiency of each method in adjudicating the

claims." *Morangelli*, 275 F.R.D. at 116 (quoting 1 Joseph M. McLaughlin, McLaughlin on Class Actions § 5:63 (6th ed. 2010)).

Courts in this circuit have considered the availability of non-judicial alternatives, such as a refund program for consumers, as an alternative method of adjudication. *See, e.g., Patton v. Topps Meat Co., LLC*, No. 07-CV-00654, 2010 WL 9432381, at *10 (W.D.N.Y. May 27, 2010) (report and recommendation) (collecting cases and recommending a finding that ongoing refund program is a superior method of adjudication); *cf. In re Scotts*, 304 F.R.D. at 415 (finding class action superior to "No Quibble Guarantee" refund program).

The findings of Congress in adopting the Class Action Fairness Act, (Class Action Fairness Act of 2005, Pub. L. No. 109-2, §2, 119 Stat. 4 (2005)) recognize that "coupon cases" should be discouraged. *See generally id.* §§ 2(a)(3) and 2(b)(1); D. Bruce Hoffman, *To Certify or Not: A Modest Proposal for Evaluating the "Superiority" of a Class Action in the Presence of Government Enforcement*, 18 Geo. J. Legal Ethics 1383, 1384 (2005) ("a coupon-based settlement of marginal value contributes little to the public interest, but it can impose unnecessary costs and other burdens on the economy and the judicial system"). The small amounts recoverable here might be analogized to coupon cases. This court's prospective denial of a damages class is not, however, predicated on that theory, but primarily on the ground that certification would violate an important New York State policy.

Circuit courts and district courts around the nation are divided as to whether the superiority requirement is satisfied where administrative agencies exist to address the key contention in the case. For example, the Third Circuit in *Amalgamated Workers Union of Virgin Is. v. Hess Oil Virgin Is. Corp.* stated that "[Rule 23(b)(3)] was *not intended* to weigh the superiority of a class action against possible administrative relief." 478 F.2d 540, 542–43 n.2

(3d Cir. 1973) (emphasis added) (reversing the trial court's dismissal of the class action, finding no merit to the trial court's finding that, *inter alia*, "[Department of Labor] has greater expertise and personnel available to determine the merits of the claims advanced[.]").  Rather, the court reasoned, the rule was "intended to refer to the preferability of *adjudicating claims of multiple-parties in one judicial proceeding and in one forum, rather than forcing each plaintiff to proceed by separate suit*, and possibly requiring a defendant to answer suits growing out of one incident in geographically separate courts."  *Id.* at 543.  (emphasis added).  Two reasons were paramount:

> [*First*], the "superiority requirement" is stated in the same sentence that requires that the questions of law and fact common to the class members predominate over any questions affecting only individual members. [*Second*], the factors stated to be pertinent to the two findings all relate to the desirability of having one suit instead of multiple suits . . . . We find *no suggestion* in the language of Rule 23, or in the committee notes, that the value of a class suit as a superior form of action was to be weighed against the advantages of an administrative remedy.

*Id.* (emphasis added) ("We leave this question, however, for disposition in an appropriate case."); *but see* Charles A. Wright, Arthur R. Miller et al., Federal Practice and Procedure: Civil § 1779 (1973), at 17 (stating that this proposition in *Amalgamated Workers* represents an "overly restrictive" reading of Rule 23(b)(3) . . . "[s]ince the purpose of the superiority requirement is to assure that the class action is the most efficient and effective means of settling the controversy, it seems inconsistent with that purpose to determine whether any administrative methods of settling the dispute exist."); *Chin v. Chrysler Corp.*, 182 F.R.D. 448, 464 (D.N.J. 1998) (collecting cases contrary to *Amalgamated Workers*).

In *Ramirez*, 668 F. Supp. 2d at 463, this court considered a putative class action brought by consumers of prepaid telephone calling cards against credit card vendors who allegedly violated the consumer fraud acts of eleven states and were unjustly enriched though deceptive

practices relating to such cards.  Since proposed legislation—which would require "the FTC to

establish and enforce a uniform nationwide system of regulation of the prepaid calling card

industry" was pending—this court held that class certification was not a superior method of

adjudication, writing:

> The superior and sensible way to deal with this controversy,
> involving as it does a multibillion-dollar national and international
> communications industry that serves millions of people in every
> state, many of them poor and uneducated, is for the Federal Trade
> Commission ("FTC") or another federal agency with authority in
> this area to issue appropriate regulations.
>
> . . .
>
> Plaintiff's allegations present issues better addressed and resolved
> on a uniform national basis, rather than by piecemeal state-law-
> based litigation. While utilization of *cy pres* or the fluid recovery
> doctrine might provide a viable remedy with some benefit to the
> class and to society, this is the *unusual situation where the present
> action's limited patchwork repairs are not worth the costs or
> benefits of allowing the case to go forward*.

*Id.* at 450–51 (emphasis added).

Where administrative agencies *have yet* to take definitive remedial measures, some courts

have relied on that fact and deemed the class action superior.  *See, e.g., Bryan v. Amrep Corp.*,

429 F. Supp. 313, 319 (S.D.N.Y. 1977).  Class members alleged violations of Interstate Land

Sales Full Disclosure Act, 15 U.S.C. § 1703 (2015), when defendants induced them to purchase

worthless land through fraud and misrepresentations.  An FTC complaint was lodged but the

status of those FTC proceedings was unclear.  It was not known whether the FTC had the power

to seek refunds for members of the proposed class since it had not previously taken any steps

towards procuring such refunds.  The court deemed a class action superior because "[t]he

possibility that the FTC *may at some future time* secure refunds for the class is not an adequate

reason to deny class determination in this case, which seeks present and independent relief." *Id.* at 318–19 (emphasis added).

Some courts have found that where evaluation of alternative methods of adjudication reveals no other "realistic possibilities," then the superiority requirement is satisfied, particularly where the action is "predicated on a statutory mandate that is designed to promote the private rectification of conduct thought undesirable." *Morangelli*, 275 F.R.D. at 116 (citing 17A Charles A. Wright, Arthur R. Miller et al., Federal Practice and Procedure § 1779 (3d. 2011)).

In the instant case, a class action seeking statutory damages is not a superior method of adjudication. The FTC is better suited to protect consumers nationally as well as those in New York. Not only does the FTC's mandate encompass investigating deceptive practices in the labeling of consumer goods, *see infra* Part X.B, the agency is *already* considering "flushable" claims made by this defendant, and those of at least one other manufacturer. *See supra* Parts III.C., III.B. In the interest of uniform protection of consumers, the FTC should address the instant case and related cases, lest inconsistent judgments and labeling abound. This risk is serious, as noted by the number of cases that have already reached varying dispositions. *See supra* Part III.A.1–3 Consumers as well as vendors require a uniform definition of "flushable," and the FTC is best suited to announce it.

A finding that administrative remedies are superior to judicial intervention is also buttressed by a consideration of the public policy of New York, *see supra* Part VIII.B, and its possible frustration by certification of a federal damages class. Although Rule 23 governs in this federal court, the policy objectives animating N.Y. C.P.L.R. § 901(b) bear heavily on the superiority analysis in the present case.

As Justice Ginsburg noted in her dissenting opinion in *Shady Grove*, § 901(b)'s restriction on class actions in cases involving statutory damages effectuates "New York's legitimate interest in keeping monetary awards reasonably bounded."  559 U.S. at 437 (Ginsburg, J. dissenting).  The purpose of § 901(b) is to prevent "harsh results" in excess of "plaintiff's actual damages."  *Id*. at 444 (citation omitted); *cf.* James Michael Walls & Carlton Fields, *Rule 23(b)(3) and the Superiority of Class Actions for Statutory Damage Claims Involving Technical Violations Resulting in No Actual Damages*, Bloomberg Law (Jan. 29, 2013), http://www.bna.com ("the aggregation of statutory damages through the class action mechanism can create potential damage awards that are ruinous to small businesses and, in some cases, large corporations, and grossly disproportionate to any actual harm caused by the technical violations of the consumer protection statutes giving rise to the statutory damage claims").

Here, the statutory damages could be excessive and in violation of state policy.  There is some justification for the prediction that Freshmates purchasers may be entitled to $95.5 million in "statutory damages."  Class Cert. Hr'g Tr. 10:11-12:10.  While *Shady Grove* does not prohibit federal class actions seeking fixed statutory damages, such an award, in this case, is inconsistent with of New York's substantive policy animating § 901(b).  An award of this projected magnitude would run counter to the policy of Congress in implementing the Class Action Fairness Act: to discourage excessively harsh results eclipsing plaintiff's actual damages.

### c.  Likely Denial of 23(b)(3) Class Certification

Based on the facts of the present case, this court is unlikely to certify a 23(b)(3) damages class on the ground that a class action is not a superior method of adjudication.

## X. Primary Jurisdiction Doctrine

### A. *Law*

"A federal agency and a district court are not like two trains, wholly unrelated to one another, racing down parallel tracks towards the same end. It is desirable that the agency and the court go down the same track—although at different times—to attain the statute's ends by their coordinate action." *Ellis v. Tribune Television Co.*, 443 F.3d 71, 92 (2d Cir. 2006) (citation omitted).

"Primary jurisdiction applies where a claim is originally cognizable in the courts, but enforcement of the claim requires, or is materially aided by, the resolution of threshold issues, usually of a factual nature, which are placed within the special competence of the administrative body." *Golden Hill Paugussett Tribe of Indians v. Weicker*, 39 F.3d 51, 58–59 (2d Cir. 1994). "A court's invocation of the doctrine does not indicate that it lacks jurisdiction." *Dean v. Colgate-Palmolive Co.*, No. 15-CV-0107, 2015 WL 3999313, at *2 (C.D. Cal. June 17, 2015) (citation omitted). "Rather, the doctrine is a prudential one." *Id.*; *see also Schiller v. Tower Semiconductor Ltd.*, 449 F.3d 286, 294 (2d Cir. 2006) (exercise of doctrine is a "prudential matter"). It applies to matters outside the "conventional experiences of judges" or those that "fall[] within the realm of administrative discretion" to administrative agencies with more specialized experience, expertise, and insight. *Nat'l Communications Ass'n, Inc. v. Am. Tel. & Tel. Co.*, 46 F.3d 220, 222–23 (2d Cir. 1995) (citation omitted) (declining to apply primary jurisdiction doctrine where telephone company's alleged unreasonable practices and unlawful discrimination in violation of the Federal Communications Act because, *inter alia*, no technical or policy issues existed that required an administrative agency's expertise). "[C]ourts apply

primary jurisdiction to cases involving technical and intricate questions of fact and policy that Congress has assigned to a specific agency." *Id.* at 223 (citation omitted).

The rationale for the doctrine is two-fold. First, it ensures "consistency and uniformity in the regulation of an area which Congress has entrusted to a federal agency." *Golden Hill*, 39 F.3d at 59. Second, the doctrine recognizes that, in some cases, the expertise and specialized knowledge of administrative agencies should be ascertained *before* judicial consideration of the legal claim. In some instances, such as the present one, it is the power of the agency to establish a uniform national policy that should be the basis for applying the primary jurisdiction doctrine.

"The threshold issue in determining whether this doctrine applies is whether both the court and an agency have jurisdiction over the same issue." *Id.* The next question is whether judicial forbearance *should* be applied, a question for which there are no "fixed rules or formulas." *Tassy v. Brunswick Hosp. Ctr., Inc.*, 296 F.3d 65, 68 (2d Cir. 2002). The doctrine, which is "discretionary," cannot "be applied mechanically." *Id.* at 72.

The Court of Appeals for the Second Circuit has identified four relevant factors:

> (1) whether the question at issue is within the conventional experience of judges or whether it involves technical or policy considerations within the agency's particular field of expertise;
>
> (2) whether the question at issue is particularly within the agency's discretion;
>
> (3) whether there exists a substantial danger of inconsistent rulings; and
>
> (4) whether a prior application to the agency has been made.

*Ellis*, 443 F.3d at 82–83.

"[T]he advantages of applying the doctrine against the potential costs resulting from complications and delay in the administrative proceedings" must be considered. *Id.* at 83

(citation omitted); *TCG New York, Inc. v. City of White Plains*, 305 F.3d 67, 74 (2d Cir. 2002) (recognizing "judicial economy as an interest that the primary jurisdiction doctrine can serve"); *but see Tassy*, 296 F.3d at 68, n. 2 (noting that the "Supreme Court has never identified judicial economy as a relevant factor" in analyzing whether to invoke the primary jurisdiction doctrine).

Class certification should not be put on hold indefinitely. *See, e.g., In re Frito-Lay N. Am., Inc. All Natural Litig.*, No. 12-MD-2413, 2013 WL 4647512, at *9 (E.D.N.Y. Aug. 29, 2013) (denying primary jurisdiction doctrine stay where the Federal Drug Administration ("FDA") was "unlikely to respond in a timely manner" and "there is no reason to believe that the FDA would abandon its deliberative process in order to respond to the Court's referral through a hurried, ad hoc, and closed manner").

The scope of the doctrine is "relatively narrow." *Goya Foods, Inc. v. Tropicana Prods. Inc.*, 848 F.2d 848, 851 (2d Cir. 1988) (citation omitted) ("applied only when a lawsuit raises an issue, frequently the validity of a commercial rate or practice, committed by Congress in the first instance to an agency's determination, particularly when the issue involves technical questions of fact uniquely within the expertise and experience of an agency"). Courts have not generally applied the primary jurisdiction doctrine where the issue is "legal in nature and lies within the traditional realm of judicial competence." *Id.*; *Nader v. Allegheny Airlines*, 426 U.S. 292, 304 (1976) (Civil Aeronautics Board lacked primary jurisdiction over fraudulent misrepresentation claim against air carrier for failure to disclose overbooking practices because the legal standards for fraudulent misrepresentation are within the "conventional competence of the courts" and did not require the judgement of a "technically expert body").

Generally, the judiciary is "well-suited" to determine a consumer's reasonable expectations about labeling. *Garcia v. Kashi Co.*, 43 F. Supp. 3d 1359, 1380 (S.D. Fla. 2014)

(collecting cases involving labeling of food products where court declined to invoke primary jurisdiction doctrine and to refer to the FDA); *Dean*, 2015 WL 3999313, at *4 (citations omitted) (denying dismissal under primary jurisdiction doctrine where, among other things, 1) the misleading advertising claims required "straightforward" application of California consumer protection laws; 2) claims could be "proved or disproved scientifically" and did not require "value judgments and policy concerns" that FDA was well suited to make; and 3) defendant failed to provide any information regarding the specifics of an FTC investigation or any details regarding how continued litigation could result in inconsistent findings).

"Under the doctrine, a court defers to the agency for advisory findings and either stays the pending action or dismisses it without prejudice." *Johnson v. Nyack Hosp.*, 86 F.3d 8, 11 (2d Cir. 1996) (citing *Reiter v. Cooper*, 507 U.S. 258, 268–69 (1993)). "[T]he court must take care that its deferral not unfairly disadvantage either party. The paramount concern is that the deferral not work as a time-bar to claims that will in all likelihood be refiled in federal court after the agency acts." *Johnson*, 86 F.3d at 11 (citation omitted).

District courts have stayed putative class actions in reliance on the primary jurisdiction doctrine to allow administrative agencies to intervene. *See, e.g., Coyle v. Hornell Brewing Co.*, No. 08-CV-02797, 2010 WL 2539386, at *7 (D.N.J. June 15, 2010) (staying putative class action for six months to allow the FDA to determine whether high fructose corn syrup qualified as a "natural" ingredient in defendant's beverages); *Allen v. State Farm Fire & Cas. Co.*, 59 F. Supp. 2d 1217, 1226 (S.D. Ala. 1999) (reporting and recommending dismissal of putative class action without prejudice, on primary jurisdiction grounds, where plaintiffs alleged, *inter alia*, breach of contract by insurance company where Alabama's insurance code sets forth procedures for taking corrective action); *but see Karhu v. Vital Pharm., Inc*., No. 13-CV-60768, 2013 WL 4047016, at

*5 (S.D. Fla. Aug. 9, 2013) (declining to dismiss based on primary jurisdiction doctrine because "[d]etermining whether a manufacturer has misled consumers is squarely within the judicial function, and does not require the special expertise of the FDA or the FTC" and defendant "does not make a showing that either agency has actually taken an interest in investigating the product").

In one case, the Eastern District of New York considered the applicability of the primary jurisdiction doctrine to a putative class action alleging that defendant engaged in false and misleading advertising in violation of, *inter alia*, New York General Business Law § 349.  *See Elkind*, 2015 WL 2344134, at *1 (putative class action alleging misleading representations, on product's labeling, of age-defying effects of cosmetics).  Defendant argued that the court should refer such claims to the FDA.  *Id.* at *9.

Applying the four factors of the Court of Appeals for the Second Circuit set out above, the court declined to dismiss plaintiff's deceptive advertising claims pursuant to the primary jurisdiction doctrine despite acknowledging that the "question lies within the FDA's discretion" where the primary issues of consumer confusion were not technical or scientific in nature, there was no risk of inconsistent rulings, there had been no prior application to the FDA, and litigation would bring a cheaper and faster resolution.  *Id.* at *10–11*; see also Ackerman*, 2010 WL 2925955, at *14 (declining to dismiss on primary jurisdiction grounds in putative class action involving consumer confusion over labeling where 1) the FDA was "aware of plaintiffs' concerns but lack[ed] the resources to take enforcement action in every instance in which its policies are violated" and had declined to do so; 2) courts were "equipped" to handle the question of whether "consumers could reasonably be misled" because it is not a technical question; and 3) there was no private right of action for plaintiffs and no reason to believe

83

resolution by the FDA would be "timely"); *Martin v. Shell Oil Co.*, 198 F.R.D. 580 (D. Conn. 2000) (denying motion to dismiss claims on primary jurisdiction grounds in a putative class action alleging trespass, nuisance, and negligence against owner of gasoline station where questions did not require specialized technical expertise, there was no risk of inconsistent rulings, the Connecticut Department of Environmental Protection had not definitively ruled, and delay of litigation would be costly); *Gilmore v. Southwestern Bell Mobile Sys., L.L.C.*, 210 F.R.D. 212 (N.D. Ill. 2001) (declining to dismiss on primary jurisdiction grounds in putative class action alleging violation of the Federal Communication Act where telephone service charged improper fee and where the claims at issue did not implicate the Federal Communication Commission's expertise nor involve an issue that called for a uniform decision).

### B. *Federal Trade Commission*

The FTC is "the federal agency primarily concerned with the regulation of advertising." Larry T. Pleiss, *Deceptive Advertising and the Federal Trade Commission: A Perspective*, 6 Pepp. L. Rev. 439, 441 (1979), http://digitalcommons.pepperdine.edu. "Historically, the FTC has been the leader in articulating the legal theories behind the law of deceptive and unfair trade practices, as well as in the development of new and more effective remedies." Dee Pridgen & Richard M. Alderman, Consumer Protection and the Law, § 1:5, Westlaw (Nov. 2014).

The Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 41 et seq., is "the primary federal law governing the general field of consumer protection and is a source of guidance for most state laws." *Id*. This "independent agency [has the] authority to regulate, among other things, advertising under [section 5]" of the FTCA. Mark A. Heller, ¶ 1240 Federal Trade Commission Act, Guide to Medical Device Regulation, at Tab 1200, *available at* 1993 WL

13580303 (2015).  Section 5 of the FTCA declares unlawful "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce . . . ."  Federal Trade Commission Act § 5(a)(1), 15 U.S.C. § 45(a)(1) (1914).

Expanding the FTC's discretion, "Congress intentionally left much of the language in the statute undefined and ambiguous."  Jeffrey H. Liebling, *Judicial Usurpation of the F.T.C.'s Authority: A Return to the Rule of Reason*, 30 J. Marshall L. Rev. 283, 283 (1996).  The FTCA provides "enough flexibility to allow the agency to prohibit practices that might eventually develop into abusive conduct."  *Id.* at 307 (discussing Supreme Court's interpretation of Congress' intent in drafting the FTCA, as presented in *F.T.C. v. Sperry & Hutchinson Co.*, 405 U.S. 233 (1972)).  For example, Congress, when drafting the FTCA and subsequent amendments, did not provide a definition of "advertising" or "products."  Robert Kenagy et al., *Tests of Deceptive Advertising Used by the Federal Trade Commission with an Application to Alternative Medicine*, 4 Contemp. Readings in L. and Soc. Justice 11, 11 (2012), http://heinonline.org.  Congress thus afforded the FTC "wide discretion . . . to ascertain the meaning of an advertiser's promise."  Pleiss, *supra* at 452.  It imbued the FTC with "flexibility to set norms of business behavior."  William E. Kovacic & Marc Winerman, *The Federal Trade Commission as an Independent Agency: Autonomy, Legitimacy, and Effectiveness*, 100 Iowa L. Rev. 2085, 2092 (2015), http://heinonline.org.

The FTC's powers are broad.  It "conduct[s] investigations, sue[s] companies and people that violate the law, develop[s] rules to ensure a vibrant marketplace, and educate[s] consumers and businesses about their rights and responsibilities."  Federal Trade Commission, https://www.ftc.gov/about-ftc/what-we-do (last visited Sept. 2, 2015).  It is "authorized to withhold enforcement unless it appears that a proceeding with respect to a particular case would

be in the best interest of the public."  § 4985 Practice and Procedure Before Federal Trade

Commission, Fletcher Cyclopedia of the Law of Corporations, Westlaw (Sept. 2015) (footnotes

omitted).

Sections 5(b) and 13(b) empower the FTC to prosecute adverse practices through

maintenance of an administrative adjudication or a court proceeding.  15 U.S.C. §§ 45(b), 53(b).

The following summarizes how the FTC performs its duties in practice:

> . . .[T]he FTC may initiate an enforcement action if it determines
> there is a "reason to believe" that the law is being violated.
> Enforcement actions may be either administrative or judicial.
>
> Once the FTC determines that there is a reason to believe that an
> action is "unfair or deceptive," it generally issues a complaint to
> the respondent setting forth the charges. The respondent can then
> either settle the charges with the FTC or contest the charges and
> proceed to an adjudication before an administrative law judge.
>
> Additionally, the FTC has the authority to attack deceptive trade
> practices by promulgating trade regulation rules to remedy unfair
> practices on an industry-wide basis.
>
> In addition, the FTC Act authorizes the FTC to seek preliminary
> and permanent injunctions to remedy "any provision of law
> enforced by the Federal Trade Commission." The FTC may ask a
> district court to enjoin allegedly illegal conduct if the FTC has
> "reason to believe" that a party "is violating, or is about to violate"
> any statute enforced by the FTC.

*The FTC Advertising Rules*, Executive Legal Summary 401, Westlaw (June 2015).

"Because the only relief that the Federal Trade Commission Act provides is before the

Commission, it affords no support whatsoever for a private cause of action."  10A Fletcher Cyc.

Corp. § 4985: 56V(C)(4) (Sept. 2015) (citation omitted).  But the "FTC frequently seeks

equitable monetary relief under Section 13(b) in consumer protection cases."  *See* D. Bruce

Hoffman, *To Certify or Not: A Modest Proposal for Evaluating the "Superiority" of A Class*

*Action in the Presence of Government Enforcement*, 18 Geo. J. Legal Ethics 1383, 1387 (2005) (citations omitted).

In exercising its authority, the FTC may conduct informal, pre-complaint inquiries concerning acts and practices in the marketplace. These informal inquiries are sometimes concluded without formal action by the agency; they may also be resolved by settlement agreement and consent order. *See generally* Federal Trade Commission, *A Brief Overview of the Federal Trade Commission's Investigative and Law Enforcement Authority* (July 2008), https://www.ftc.gov/about-ftc/what-we-do/enforcement-authority.

The Federal Trade Commission issues formal and informal opinions in the following circumstances:

> a) Any person, partnership, or corporation may request advice from the Commission with respect to a course of action which the requesting party proposes to pursue. The Commission will consider such requests for advice and inform the requesting party of the Commission's views, where practicable, under the following circumstances.
>
> > (1) The matter involves a substantial or novel question of fact or law and there is no clear Commission or court precedent; or
> > (2) The subject matter of the request and consequent publication of Commission advice is of significant public interest.
>
> (b) The Commission has authorized its staff to consider all requests for advice and to render advice, where practicable, in those circumstances in which a Commission opinion would not be warranted. Hypothetical questions will not be answered, and a request for advice will ordinarily be considered inappropriate where:
>
> > (1) The same or substantially the same course of action is under investigation or is or has been the subject of a current proceeding involving the Commission or another governmental agency, or

> (2) An informed opinion cannot be made or could be made only after extensive investigation, clinical study, testing, or collateral inquiry.

16 C.F.R. § 1.1.

"A request for advice is initiated by submitting three copies of the request to the Secretary of the FTC, which should state clearly the questions to be resolved, cite provisions of law under which the question arises, and set forth all material facts." 2 Stephanie W. Kanwit, Fed. Trade Comm'n. § 25:2 (2014) (citations omitted). Where the Commission determines that a formal opinion is "unwarranted," the Commission can issue an informal opinion or forward the request "to the appropriate bureau for an informal reply." *Id*. §§ 25:2 n. 7, 25:3.

There is an overlap between the FTC and private litigation. *See, e.g.*, Adam S. Zimmerman, *Distributing Justice*, 86 N.Y.U. L. Rev. 500, 553 (2011) ("agency settlements increasingly serve the same goals as large-scale litigation"); *but see Compensation for Mass Private Delicts: Evolving Roles of Administrative, Criminal, and Tort Law*, 2001 U. Ill. L. Rev. 947 (2001) (discussing cooperation among administrative agencies and courts adjudicating criminal and civil litigation). By providing for a stay rather than dismissal of the parallel action in court, the overlap is effectively managed.

### C. *Application of Law to Facts*

The plaintiff, addressing the matter of an injunctive class, concedes that the court has the power to stay. *See* Pl.'s Mem. of Law in Resp. to the Ct's Order, Sept. 9, 2015, ECF No. 139, at 4. The case is stayed, pursuant to the primary jurisdiction doctrine, pending the conclusion of the FTC's inquiry and any subsequent action by the agency. The stay may be lifted by the court to avoid unnecessary delays or for other reasons.

### 1. Control by Judges or the Federal Trade Commission?

The questions at issue are: first, what does or should a reasonable consumer reasonably understand "flushable" to mean?  And second, do Freshmates perform according to this understanding?  *See also* IX.B (listing additional questions).  These questions are within the conventional experience of judges, who often hear cases involving the labeling of consumer goods.  *See supra* 82 (collecting cases).  The science underlying Freshmates is not so technical that the court cannot understand it.  *See generally* Science Day Parts I & II.  This factor leans in favor of not issuing a stay.  Nevertheless, the court, in its discretion and based on the analysis below, finds exercise of jurisdiction by the FTC is merited in this case at this time.

### 2. Federal Trade Commission's Discretion

The FTC is specifically tasked with addressing deceptive labeling.  *See supra* Part X.B. Determining whether the term "flushable" is deceptive to a reasonable consumer is directly within the agency's discretion, as already evidenced by its informal investigation into defendant's labeling of "flushable" and its current intervention with a different seller and manufacturer's labeling of "flushable" wipes.  *See supra* Parts III.B–C, X.B.

On the question of the FTC's discretion, New York General Business Law § 349 expressly provides that it "shall be a complete defense" under the statute if the challenged act or practice "complies with the rules and regulations of, and the statutes administered by the federal trade commission . . . as such rules, regulations or statutes are interpreted by the federal trade commission."  N.Y.G.B.L. § 349(d).  Thus, a determination by the FTC that defendant's flushability claims are supported by, or not supported by, competent evidence under the FTCA would, at a minimum, be important to proceedings in this court and could be conclusive.

### 3.  Inconsistent Rulings?

There may be substantial danger of inconsistent rulings among various courts and the FTC.  As the FTC enters a draft consent agreement with one manufacturer and engages in an informal inquiry of defendant, *see supra* Part III.B–C, six additional putative class actions, brought by consumers against manufacturers or sellers of "flushable" wipes, are pending before this court.  *See supra* Part III.A.1.  Four other cases have been filed in other jurisdictions; one was dismissed and another was remanded to state court.  *See supra* Part III.A.2.  A putative class action, brought by municipalities and other affected organizations, is pending in another jurisdiction.  *See supra* Part III.A.3.  New York City is considering legislation regarding flushability.  *See supra* Part III.D.  Meanwhile, some wastewater facilities are separately issuing their own recommendations to customers, urging them not to flush "flushable" wipes.  *See supra* Part III.E.  Yet, there is no consensus on the definition of "flushable."  *See supra* Part IV. Whether wipes should be labeled "flushable" is a national issue that requires a single national resolution.

### 4.  Existing Consideration by Federal Trade Commission

As stated above, the FTC has already intervened in the flushability debate, launching an informal inquiry into defendant's labeling and entering a draft consent order with another manufacturer.  *See* Part III.B–C.

### 5.  Advantages Versus Costs

The advantages to staying proceedings outweigh any costs.  The FTC is already expending resources to determine what is "flushable."  An FTC determination will enable courts to determine whether different manufacturers' and seller's labeling was accurate.  This will save significant resources.  The FTC inquiry could effectively end the alleged need for injunctive

relief.  If the wipes are found by the FTC to be not "flushable," parties will either enter into FTC consent orders to change their packaging; the industry will, on its own, change its packaging to accord with the FTC's finding; or courts will enforce the FTC's findings in pending cases.

Adjudication by the FTC, as compared to the court, is in the public interest.  The FTC allows for public comment, while an individual class action generally does not.  *But see* Essay, *The Democratization of Mass Actions in the Internet Age*, 45 Colum. J. L. & Soc. Probs. 451, 460 (2012) (democratization techniques to permit comment by affected parties and the public may be helpful, but may not solve the fundamental problems of mass litigation).

## XI.   Court's Inherent Authority to Stay Decision on Class Certification

"[D]istrict courts have broad scope to manage their own dockets in light of considerations of economy of time and effort for itself, for counsel, and for litigants."  *In re Zyprexa Products Liab. Litig.*, 594 F.3d 113, 127 (2d Cir. 2010) (citation omitted).  Thus, separate and apart from the primary jurisdiction doctrine, courts possess discretionary authority to stay decision on class certification pending resolution of an agency's inquiry or adjudication.  For example, the Court of Appeals for the Second Circuit stayed a case pending resolution of issues before the National Labor Relations Board ("NLRB") without invoking the primary jurisdiction doctrine, reasoning that a stay would promote judicial efficiency due to the NLRB's special expertise, would reduce the risk of inconsistent adjudications, and would place the district court in a better position to determine the most appropriate course going forward."  *Int'l Org. of Masters, Mates & Pilots v. Trinidad Corp.*, 803 F.2d 69, 74 (2d Cir. 1986).

In light of the FTC's special expertise, in the interest of judicial economy created by a national uniform rule, and in consideration of the New York State policy embodied in N.Y.

C.P.L.R. § 901(b), the case is stayed to permit the FTC to determine a uniform definition of "flushable" and related matters.

## XII. Conclusion

Plaintiff's motion to certify the class and defendant's motion to deny class certification are stayed. Discovery is stayed. The issue of an appropriate definition of "flushable" and related issues are respectfully referred to the Federal Trade Commission.

The Clerk of the Court is directed to serve three copies of this memorandum and order on the Secretary of the Federal Trade Commission.

SO ORDERED.

Jack B. Weinstein
Senior United States District Judge

October 5, 2015
Brooklyn, New York

92